502 F.2d 914
 GOVERNMENT OF the VIRGIN ISLANDS
v.
Beaumont GEREAU, Appellant in Nos. 73-1775 and 73-1873, et al.
Appeal of Ishmael La BEET in No. 73-1776 and No. 73-1874.
Appeal of Warren BALLANTINE, in No. 73-1777 and No. 73-1875.
Appeal of Meral SMITH, in No. 73-1778 and No. 73-1876.
Appeal of Raphael JOSEPH, in No. 73-1779 and No. 73-1877.
 Nos. 73-1775 to 73-1779 and Nos. 73-1873 to 73-1877.
 United States Court of Appeals, Third Circuit.
 Argued May 13, 1974.
Decided Aug. 15, 1974.
 
 William M. Kunstler, New York City, for appellant Beaumont Gereau.
 Margaret L. Ratner, New York City, for appellant Warren Ballantine.
 Chauncey Eskridge, McCoy, Ming & Black, Chicago, Ill., for appellant Ishmael La Beet.
 Leroy A. Mercer, Christiansted, St. Croix, V.I., for appellant Meral Smith.
 Ronald T. Mitchell, Mitchell & Hunter, Charlotte Amalie, St. Thomas, V.I., for appellant Raphael Joseph.
 Julio A. Brady, U.S. Atty., Christiansted, St. Croix, V.I., John Barry, Richard S. Zackin, Asst. U.S. Attys., for appellee.
 Before SEITZ, Chief Judge, and VAN DUSEN and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Appeals are taken here from defendants-appellants' conviction, after trial to a jury in the District Court of the Virgin Islands, and sentencing for murder, assault and robbery[1] and from denial of their motion for a new trial. Because the factual basis for the appeals is somewhat complex, we will elaborate the facts, as relevant, in our discussion of the various issues raised by defendants and set forth here only those facts necessary to a basic understanding of this case.
 
 
 2
 On the afternoon of September 6, 1972, a group of young men entered the clubhouse area of the Fountain Valley Golf Course in St. Croix. Sixteen persons, including guests and staff, were in the clubhouse area at that time. The intruders, armed with a variety of weapons including a machine gun and shotguns, took cash from a clubhouse shop and snack bar, robbed some of the guests and killed eight persons. Four others were wounded while trying to escape and the remaining four were able to escape unharmed. The survivors reported seeing various numbers of gunmen, agreeing that the men wore masks and fatigue-type shirts and perhaps also fatigue pants.
 
 
 3
 Prior to the incident at Fountain Valley, arrest warrants had been issued for three of the defendants in this case, Ishmael La Beet, Warren Ballantine and Raphael Joseph, on charges including first degree assault, simple assault and battery, and failure to appear in court after release on bond. La Beet, Ballantine and Joseph had reportedly been seen in the general vicinity of Fountain Valley wearing fatigue shirts, a short time before the crimes with which they are charged here took place. The three immediately became suspects. Police also sought associates of La Beet, Ballantine and Joseph for questioning, among them the remaining defendants in the case, Meral Smith and Beaumont Gereau, who were seen with the trio the night before and afternoon of the Fountain Valley killings.
 
 
 4
 During the week following the killings, Virgin Islands police working with agents of the Federal Bureau of Investigation arrested all five of the defendants and seized all the weapons used in the killings along with articles of clothing identified as having been worn by the gunmen and various items taken from guests at the time of the shootings. Before dealing with the defendants' specific contentions, we will summarize the series of arrests, searches and confessions that produced the bulk of the evidence introduced at trial and all of the evidence use of which is challenged by defendants.
 
 
 5
 Early on September 7, Smith was arrested at 160 Estate Grove Place, where he had been observed little more than a day earlier with the other defendants. Police engaged in a warrantless search of 160 Estate Grove Place, at the time of Smith's arrest and again a few hours later. On September 8, a police officer attempting to locate another associate of defendants, one McIntosh, got into an altercation with yet another young man who answered the door at 46 Prince Street, Fredriksted, in front of which McIntosh had been seen earlier. The fight between the police officer and the young man started at the front door and progressed through the house, ending in a room in which Gereau had taken refuge. The policeman arrested Gereau, who he believed was wanted for failure to appear and answer to an assault charge. Later that day, police returned to and, with the owner-occupant's consent, searched 46 Prince Street. On September 8 and 9, after questioning, Smith and Gereau gave statements to F.B.I. agents regarding their and the other defendants' participation in the Fountain Valley incident. Also on September 9, agents and police conducted a warranted search of 160 Estate Grove Place. Late in the afternoon of September 9, Smith and Gereau were arraigned.
 
 
 6
 Warrants issued on September 10 for the arrest of defendants La Beet, Ballantine and Joseph for murder, robbery and assault at Fountain Valley. Warrants also were issued for the arrests of two described and partially named Puerto Ricans implicated in the statements given by Smith and Gereau. The three defendants were arrested during the afternoon of September 12 at 527 Hospital Street, Fredriksted. F.B.I. agents and police searched the Hospital Street premises, with a search warrant, at the time of defendants' arrest and again, with a warrant, a few hours later. Statements regarding their participation in the Fountain Valley killings were given by La Beet, prior to the second Hospital Street search, and by Ballantine and Joseph on September 12 before their arraignment that evening. On September 14, Gereau gave another statement, later suppressed, admitting that the two Puerto Ricans he and Smith had implicated in the crimes were fictional.
 
 I. SUPPRESSION ISSUES
 
 7
 Before trial, defendants moved to suppress the statements given by them and the evidence seized in the searches noted above. The District Judge suppressed the statements given by defendants Smith and Joseph, finding that they had requested to see a lawyer and were denied an opportunity to do so until, after further questioning, their statements were obtained.[2] The district court also suppressed Gereau's statement of September 14, which was not immediately preceded by warning Gereau of his right to have counsel present. In all other respects the motion to suppress was denied. Crim. No. 97/1972 (D.V.I. July 23, 1973). Defendants contend that the Court erred in denying suppression of other statements and tangible evidence. We turn now to those contentions.
 
 
 8
 Statements of Gereau, La Beet and Ballantine: Brutality Claims
 
 
 9
 The first line of attack on admission of statements by defendants Gereau, La Beet and Ballantine is the defense claim that the statements were obtained as a result of brutal police treatment. Defendants allege that they were beaten, shocked with electric shock batons, burned with cigar stubs, partially suffocated by police placing plastic bags over their heads and by covering their mouths while dripping water into their nostrils, hung from certain trees, and otherwise mistreated. Testimony by various witnesses is pointed to by defendants as supporting portions of defendnats' testimony regarding police brutality directed at them. They admit that a wealth of conflicting testimony was introduced by the government and that defendants' testimony along with the testimony relied on by defendants as corroborating their stories was found by the District Judge not to be credible. Defendants contend, however, that the court below used improper legal standards to judge credibility.
 
 
 10
 It is the law of this Circuit, as well as many others, that a fact-finder's determination of credibility is not subject to appellate review. United States v. Brown, 471 F.2d 297, 298 (3d Cir. 1972); United States ex rel. Tillery v. Cavell, 294 F.2d 12, 22 (3d Cir. 1961), cert. denied, 370 U.S. 945, 82 S.Ct. 1589, 8 L.Ed.2d 811 (1962); see e.g., United States v. Owens, 472 F.2d 780, 784-785 (8th Cir. 1973); Wilkin v. Sunbeam Corp.,466 F.2d 714, 717 (10th Cir. 1972), cert. denied, 409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258 (1973). Credibility determinations may be influenced by factors such as a witness' demeanor, his tone of voice and other matters not subject to appellate scrutiny. For this reason, credibility determinations are uniquely the province of the fact-finder. Assuming, however, that we can separate the standards employed to make such determinations from their application to decide credibility, we find no error in the District Judge's selection of those standards. The court below found, on the basis of a horticultural expert's testimony, that defendants could not possibly have been 'hung' as they claimed from any of the trees in the area where the hangings allegedly took place; defendants' testimony, found false in this respect, was then discounted by the judge with respect to other matters, as to which the judge also found their accounts to be inherently incredible in various respects. We find no error in this. Defendants assert that the judge should have discounted testimony of police and F.B.I. agents because suit had been filed against them for violation of defendants' civil rights. Mere pendency of such a suit, however, cannot be viewed as grounds for discounting agents' testimony as biased. Defendants challenge the lower court's credibility determinations on numerous other grounds less substantial than those set forth above; we have considered their contentions and find it unnecessary to treat the additional claims separately.[3]
 
 
 11
 Accepting the district court's credibility determinations, we cannot say its finding that the statements by Gereau, La Beet and Ballantine were not products of police brutality is clearly erroneous. See Krasnov v. Dinan,465 F.2d 1298, 1302-1303 (3d Cir. 1972); United States v. Archie, 452 F.2d 897, 898-899 (3d Cir. 1971) (per curiam), cert. denied, 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972). This is particularly so in light of defendants' burden in support of their suppression motion to show by a preponderance of the evidence that the Government engaged in illegal acts. See United States v. Lyon, 397 F.2d 505, 508 (7th Cir.), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); United States v. Masterson,383 F.2d 610, 614 (2d Cir. 1967), cert. denied, 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968). We therefore reject defendants' contention that their statements should have been excluded as the products of police brutality.
 
 Statements: Presentment Delay
 
 12
 Defendants next contend that the statements given by Gereau, Ballantine and La Beet should have been suppressed because defendants were not presented to a magistrate within six hours of their arrests. This argument rests on the interpretation of Rule 5(a) of the Federal Rules of Criminal Procedure[4] adopted in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).
 
 
 13
 Mallory interpreted Rule 5(a) as allowing 'arresting officers little more leeway than the interval between arrest and the ordinary administrative steps required to bring a suspect before the nearest available magistrate.' 354 U.S. at 453, 77 S.Ct. at 1359. After Mallory, and before commission of the offenses with which defendants are charged here, the Omnibus Crime Control and Safe Streets Act of 1968 was enacted, including a provision expressly designed to provide a test different from Mallory's for judging the admissibility in federal criminal prosecutions of confessions given during the period between arrest and arraignment before a magistrate. See 1968 U.S.Code, Cong. & Ad.News 2112, 2123-2127, 2141, 2216, 2240. If that provision, codified as 18 U.S.C. 3501 (1970), is applicable to the Virgin Islands, it must control the admissibility of the statements challenged here. Defendants, however, dispute 3501's applicability to trials for local crimes in the District Court of the Virgin Islands.
 
 
 14
 Rule 54(a) makes the Federal Rules of Criminal Procedure applicable to all criminal proceedings in the District Court of the Virgin Islands, and the Rules have been held to apply even in prosecutions for local crimes. Government of the Virgin Islands v. Solis, 334 F.2d 517, 519 (3d Cir. 1964). The Rules explicitly recognize that the admissibility of evidence in cases governed by the Rules is subject to determination by acts of Congress. Fed.R.Crim.P. 26. Thus, 18 U.S.C. 3501 controls the admissibility in prosecutions subject to the Federal Rules, of defendants' statements made after arrest and before presentment to a magistrate, and must be viewed as altering interpretation of Rule 5(a)'s direction that an arrested person be taken before a magistrate 'without unnecessary delay.'[5] Defendants, however, note that 3501 is made applicable expressly only to prosecutions by the United States and the District of Columbia. We have found no indication in the legislative history of the Act that Congress intended 3501 to be inapplicable in criminal prosecutions in the Virgin Islands and, in light of the Federal Rules' applicability to proceedings in the District Court of the Virgin Islands, find it more plausible that Congress intended conformity with the rule announced by 3501 in all prosecutions subject to the Rules than that the language noted by defendants was chosen to distinguish prosecutions by the Virgin Islands from prosecutions by the listed jurisdictions.
 
 
 15
 Section 3501 provides that confessions are admissible if voluntarily given and that in determining voluntariness the trial judge shall take into consideration all relevant circumstances including the time between arrest and arraignment (where, as here, the challenged statements were made within that time), whether defendant knew he was suspected of the crime concerned when he made his statement, whether defendant was informed that he was not required to make a statement and that he had a right to counsel. 18 U.S.C. 3501(a) and (b) (1970). The section then declares that a statement shall not be inadmissible solely because of delay if (1) the trial judge finds the statement to have been made voluntarily, (2) the weight to be given the statement is left to the jury, and (3) the statement was made within six hours of arrest, noting further that a statement after more than six hours following a defendant's arrest shall not be excluded if the delay beyond six hours was reasonable considering the means of transportation available and distance to the nearest magistrate. 18 U.S.C. 3501(c) (1970).
 
 
 16
 In admitting statements by La Beet, Ballantine and Gereau, the District Judge expressly found them to have been made voluntarily. All three defendants were advised of their rights before questioning and before making their statements. The District Judge found that the Government had satisfied its burden of showing that defendants had waived those rights, and defendants have not demonstrated that this finding was clearly erroneous. The judge also noted that the defendants were not questioned continuously for long periods; they were given food and drink on request and when Gereau indicated he was tired, he was allowed to sleep overnight before questioning resumed the next morning. La Beet's statement was started and completed within six hours of his arrest and Ballantine's statement was begun within six hours of his arrest. One statement of Gereau's was given well within the six hour period although his statements on September 9 were not. In light of the surrounding circumstances, we find no clear error in the district court's decision that the challenged statements were given by defendants voluntarily. See United States v. Moore, 453 F.2d 601 (3d Cir. 1971), cert. denied, 406 U.S. 925, 92 S.Ct. 1794, 32 L.Ed.2d 126 (1972).
 
 
 17
 Defendants, however, contend that since La Beet, Balantine and Gereau were not arraigned until more than six hours after arrest and the delays were not related to difficulties in transporting defendants to a magistrate, 3501(c) requires their statements to be excluded. We reject this contention. The express declaration of 3501(c) makes clear that a statement voluntarily given within six hours of arrest is not excludable because of delay in presentment after the statement was given. United States v. McCormick, 468 F.2d 68, 74 (10th Cir. 1972); see United States v. Mitchell, 322 U.S. 65, 70-71, 64 S.Ct. 896, 88 L.Ed. 1140 (1944). The section makes admissible voluntary statements, given within six hours of arrest, the weight of which is left to the jury. These statements, excepting Gereau's statements of September 9, meet all three requirements and thus are admissible. We cannot alter the section's clear statement to that effect by negative implication from its proviso that presentment delays of more than six hours shall not make statements excludable if reasonable in light of transportation difficulties. Nor can we find that the negative implication defendants draw from 3501(c)'s proviso, that statements given before presentment but more than six hours after arrest must be excluded unless due to transportation problems, renders Gereau's September 9 statements inadmissible. Section 3501 makes admissibility of confessions dependent on their voluntariness. Delay in a defendant's presentment to a magistrate is only one factor relevant to voluntariness. 1968 U.S.Code, Cong. & Ad.News 2127. Section 3501(c) modifies the trial judge's freedom to determine voluntariness by stating certain instances in which the judge cannot on the basis of delay alone find a statement to have been involuntary. Statements not within the categories defined in 3501(c) are not excluded but instead their admissibility is determined by the general standard of voluntariness set forth in 3501(a) and (b). United States v. Marrero, 450 F.2d 373 (2d Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972); United States v. Halbert, 436 F.2d 1226, 1232-1237 (9th Cir. 1970); 1 C. Wright & A. Miller, Federal Practice and Procedure Criminal 74 (1969). As set forth above, defendants have not demonstrated clear error in the district court's determination of voluntariness. We cannot, therefore, find that Gereau's statements of September 9 were improperly admitted.
 
 Statements: Challenge to Arrests
 
 18
 Finally, defendants argue that the statements of Gereau, La Beet and Ballantine should have been suppressed as the fruits of illegal arrests. We turn first to Gereau's arrest. As described previously, at the time of his arrest no warrant had issued in connection with the Fountain Valley killings. Various persons, Gereau among them, were being sought by the Virgin Islands police for questioning concerning La Beet, Ballantine and Joseph. One such person was Rupert McIntosh, who had reportedly been seen near 46 Prince Street the morning of September 8. A police officer, Sergeant Hodge, went to the home at that address, knocked and asked the man who opened the door, Edwin Joseph (no relation to Raphael Joseph), if McIntosh was in the house. Hodge testified that Edwin Joseph denied any Knowledge of McIntosh, told Hodge, expletives included, to let go of the door and shoved Hodge. At that point Hodge told Edwin Joseph that he was 'under arrest,' and Joseph then ran back into the house. Hodge pursued him through numerous rooms in the house, the chase ending in a room where Gereau was present. Hodge knew that Gereau earlier had been charged with simple assault and battery but had failed to appear in court at the time set for him to answer the charge. Believing that an arrest warrant had issued in connection with Gereau's unsanctioned absence from court, Hodge arrested Gereau. The District Judge, however, found that the warrant for Gereau's arrest in fact issued on September 8 following the arrest.
 
 
 19
 It is clear that the warrantless arrest was illegal under Virgin Islands law. The Virgin Islands Code, as relevant, authorizes a police officer to effect a warrantless arrest if he knows that a felony was committed and has probable cause to suspect the person arrested of its commission. 5 V.I.C. 3562 (1967). Both simple assault and battery and failure to appear to answer a criminal charge are misdemeanors. 14 V.I.C. 299, 585 (1964). Hence, neither could support Gereau's arrest and no claim is advanced that at the time of Gereau's arrest police had probable cause to believe Gereau participated in the Fountain Valley crimes.
 
 
 20
 Although the initial arrest of Gereau was, thus, illegal, the district court found that Gereau was 'rearrested' when the warrant issued for his arrest for failure to appear in court. Defendants do not contest the findings that Gereau was charged with assault and battery, that he failed to appear as required to answer the charge, that a warrant was issued on September 8, shortly after his arrest, authorizing Gereau's arrest for failure to appear and answer criminal charges and that his statements were given after the issuance of the warrant. Defendants do urge us, as a prophylactic measure to insure against improper arrests, to hold that statements taken from an improperly arrested defendant are inadmissible unless the defendant was released from custody before giving the statement. Cf. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Pennsylvania ex rel. Craig v. Maroney, 348 F.2d 22, 29-32 (3d Cir. 1965). We can find no useful purpose that would be served by requiring police to release someone already in custody and for whom a valid arrest warrant has been issued. It would be a meaningless charade to require police to march suspects to the station-house door, 'release' them and then rearrest them, or even worse to make police give suspects a head start before pursuing them for a lawful rearrest. We, therefore, hold that Gereau's fictional 'rearrest' at the time the warrant issued resulted in his being lawfully in police custody at the time he gave his statements.
 
 
 21
 Defendants argue that, nonetheless, the statements should have been suppressed because Gereau's arrest for his non-attendance at court proceedings was only a pretext on which to hold Gereau while questioning him regarding the Fountain Valley killings. Where police have arrested persons suspected of serious crimes on the pretext of some minor offense so that the suspects could be searched, the fruits of the search have been suppressed. See Amador-Gonzalez v. United States, 391 F.2d 308, 313-318 (5th Cir. 1968); Taglavore v. United States, 291 F.2d 262, 265-267 (9th Cir. 1961). Here, however, no claim is made that Gereau's arrest was a pretext for a search. We find no similar basis or objection to questioning a suspect properly arrested for one crime about another respecting which he might have information.[6] The admissibility of statements resulting from such questioning is subject to a determination of voluntariness that protects the defendant from the seizure of information he does not agree to divulge while no similar protection limits admissibility of evidence seized within the scope of a search incident to arrest. Suppression of Gereau's statement as the product of a pretext arrest, thus, was properly denied.
 
 
 22
 Defendants contend that the warrants authorizing the arrests of La Beet and Ballantine failed to satisfy the Fourth Amendment's requirement that warrants issue only if supported by probable cause.[7] This contention rests on defendants' assertion that Gereau's statements implicating La Beet and Ballantine in the Fountain Valley crimes should have been suppressed and, therefore, could not be used to support issuance of warrants for their arrest. We need not decide whether, if Gereau's statements should have been suppressed, this contention would have merit, or whether La Beet and Ballantine have standing to raise this matter. Cf. Wong Sun v. United States, supra. Having found no error in denying suppression of Gereau's statements, we reject defendants' argument that the arrest warrants for La Beet and Ballantine were not based on the probable cause requisite under the Fourth Amendment.
 
 Searches: 160 Estate Grove Place
 
 23
 Defendants challenge the District Judge's refusal to suppress the evidence seized in each of the searches described earlier. The first such search occurred at 160 Estate Grove Place immediately following the arrest of defendant Smith. That site was subsequently searched two more times. The first two searches at Grove Place were made without warrants and the third search was pursuant to a search warrant obtained on the basis of evidence gathered in the first two. The Government has advanced several theories to support these searches, each of which is contested by defendants. One argument put forward by the Government is that all these searches were based on the voluntary consent of Smith's uncle, James Tuitt.
 
 
 24
 While exceptions to the Fourth Amendment's warrant requirement are 'few in number and carefully delineated,' United States v. United States District Court, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972), 'one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent,' Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Defendants do not claim that the Government has failed to carry its burden of showing that Tuitt's consent was freely and voluntarily given, see Schneckloth v. Bustamonte, supra at 222, 93 S.Ct. 2041, but rather contend that Tuitt lacked authority to consent to the searches. Authority to consent does not, for Fourth Amendment purposes, turn on ownership of the property searched. See e.g., Chapman v. United States, 365 U.S. 610, 616-618, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). An owner or user of property can consent to search of that property, fruits of which may be admitted against another person, only if the relationship of each person to the property demonstrates that the nonconsenting user assumed the risk that such consent might be given. United States v. Matlock, 415 U.S. 164, at 171, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).
 
 
 25
 The district court here found that Smith must have assumed the risk that Tuitt would consent to a search of the room he used at 160 Estate Grove Place because Smith was a trespasser on his uncle's property. It seems clear to us that, as a general matter, a trespasser must be deemed to assume the risk that the owner of the property will consent to its search. Defendants do not dispute this proposition, but vehemently contest the court's finding that Smith was in fact a trespasser. That finding by the district court binds us unless clearly erroneous-- the finding must be accepted unless 'the reviewing court is convinced on the whole record that a mistake has been committed.' Fisher v. United States, 441 F.2d 1288, 1290 (3d Cir. 1971); see United States v. Delerme, 457 F.2d 156, 160 (3d Cir. 1972). We are not convinced that a mistake has been committed and find ample evidence in the record to support the district court's finding. Tuitt paid ttaxes for the house, the assessment for taxes for the house, the assessment for the house, Smith had none; although Smith claimed part ownership of the house, he had listed other real estate, but not 160 Estate Grove Place, on the financial affidavit Smith filed with the district court after his arrest; Smith had asked Tuitt's permission to have Gereau stay in the part of the house which Smith claimed to own at the suppression hearing; and finally Tuitt told Smith not to use the Grove Place house and called the police on more than one occasion when Smith came to the house. That the house had two sections without interior access between them and Tuitt lived in only one section did not make Smith any less a trespasser nor did it substantially alter the risk he assumed. The District Judge's finding that Smith was a trespasser at Grove Place is not clearly erroneous and he properly concluded that Tuitt had the requisite authority to consent to the Grove Place searches.[8] The district court, thus, did not err in refusing to suppress items seized in those searches.
 
 
 26
 Defendants argue that even if we sustain admission of the items taken in searches of 160 Estate Grove Place, we must find that the district court erred in refusing to suppress a luger found nearby. The luger, which tests determined was used in the Fountain Valley killings, was found on September 9, 1972, on a rooftop near 160 Estate Grove Place after Smith had given a statement admitting that he had thrown a gun out of the rear window of 160 Estate Grove Place at the time of his arrest. Smith's statement was suppressed because it was given following his indication of a desire to have an attorney present, and defendants contend the luger should be suppressed as the product of this statement. To sustain admission of the luger, the Government must prove, by clear and convincing evidence, that the evidence was not found as a result of Smith's improperly obtained statement. United States v. Archie, supra, 452 F.2d at 898; see Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); United States v. Falley, 489 F.2d 33, 41 (2d Cir. 1973). The Government seeks to meet its burden not by refuting the claim that Smith's statement hastened location of the luger, but by showing that police and F.B.I. agents would have found the luger even without Smith's statement. Several officers testified that, shortly after police called to Smith to come out from 160 Estate Grove Place, a window in the rear of the house opened, a noise was heard that might have been metal or stone striking a rooftop, the window shut and, a few moments later, Smith exited through a front window. Throughout the week following the Fountain Valley killings a very large number of police officers and F.B.I. agents were engaged in a massive effort to find the killers and the weapons used by them. The autopsy and ballistics reports identified five murder weapons, one of which was the luger. The District Judge found that, in light of the observations of the police officers, the nature of the 'saturation' search being conducted, the location of the luger (which, while out of sight, was neither concealed so as to make detection exceedingly difficult nor deposited in a location far removed from any place police had reason to search), and its identification as a murder weapon, the police and F.B.I. agents would have found the luger without utilization of Smith's statement. We cannot say this finding is clearly erroneous and conclude that it satisfies the Government's burden to show that the luger was not the 'fruit of the poisonous tree.' See Wong Sun v. United States, supra, 371 U.S. at 487-488, 83 S.Ct. 407; United States v. Falley,supra, 489 F.2d at 40-41; Killough v. United States, 119 U.S.App.D.C. 10, 15, 336 F.2d 929, 934 (1969). Suppression of the luger, thus, was properly denied.
 
 Searches: 527 Hospital Street
 
 27
 Police and F.B.I. agents conducted two searches at 527 Hospital Street, one at the time La Beet, Ballantine and Joseph were arrested there and the second a few hours later. The first of these searches was conducted without a warrant, and, therefore, the burden of justifying the search is on the Government. E.g., United States v. Gamble, 473 F.2d 1274, 1276 (7th Cir. 1973); Schnepp v. Hocker, 429 F.2d 1096, 1099 (9th Cir. 1970). The Government claims that its entry was lawful because the search was intended to find persons for whom the Government possessed arrest warrants, the two Puerto Ricans implicated by Smith and Gereau. This Court has made clear, however, that arrest warrants are not substitutes for search warrants. See Fisher v. Volz, 496 F.2d 333, 338-343 (3d Cir. 1974). Although police have warrants for the arrest of suspects, they may enter premises, at least of third persons, to search for those suspects only in exigent circumstances where the police officers also have probable cause to believe that the suspects may be within. See id. at 338-339.
 
 
 28
 Among the factors the U.S. Court of Appeals for the District of Columbia Circuit has identified as relevant to 'exigent circumstances' are that a grave offense has been committed, that the suspect sought is reasonably believed armed, that a strong reason exists to believe the suspect is on the premises and a likelihood that the suspect might escape if not caught quickly. Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 392-393 (1970) (in banc). This Court has looked to similar factors in deciding that exigent circumstances exist. United States v. Rubin, 474 F.2d 262, 268-269 (3d Cir. 1973). After examining the facts established, findings of the District Judge and the record made below, see Ker v. California, 374 U.S. 23, 24, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1967); United States v. 1964 Ford Thunderbird, 445 F.2d 1064, 1069 (3d Cir. 1971), cert. denied, Bivens v. United States, 405 U.S. 964, 92 S.Ct. 1181, 31 L.Ed.2d 239 (1972), we conclude that the Government here has carried its burden by showing that both exigent circumstances and probable cause supported the challenged search.
 
 
 29
 On September 12, 1972, police had in custody Smith and Gereau, who had given statements declaring that five other persons were involved in the Fountain Valley crimes. Arrest warrants were obtained for all five persons. Police had been attempting, unsuccessfully, to locate three of these persons, La Beet, Ballantine and Joseph, since before the incident at Fountain Valley. They had every reason to believe that the five suspects were fugitives who would not tarry long in any place accessible to the local and federal authorities and had reasonable ground to believe that the suspects had committed grave offenses and were heavily armed.[9] In this setting the police received a tip, from an informant who previously had given them information leading to suspects' arrests, that the suspects, still at large, sought in connection with the Fountain Valley killings, were in the vicinity of 527 Hospital Street. These circumstances satisfy the test of exigency-- it was imperative that police move quickly, without waiting for a search warrant to be secured, to arrest the five suspects.
 
 
 30
 Police and F.B.I. agents proceeded to 527 Hospital Street, at which address four structures are clustered: an outhouse and three larger buildings, one apparently marked 527 and two adjacent to it. When agents identified themselves and called for the suspects to come out, La Beet, Ballantine and Joseph exited from one of the buildings. Agents then entered that building and the other two adjacent buildings to search for the two Puerto Ricans for whom they had warrants.[10] At the time the police officers arrived at 527 Hospital Street, the circumstances noted above provided the required exigency necessary to a valid warrantless, unconsented search. Although occurrences after police have arrived to effect an arrest may create or destroy the necessary exigency, see United States v. Holiday, 457 F.2d 912, 914 (3d Cir. 1972), the emergence of three of the five suspects neither increased nor destroyed the exigency here. Two suspects whom the police reasonably believed to be heavily armed and to have participated in eight murders were still at large. They had eluded police efforts to locate them and had no known or knowable residence address on the island.
 
 
 31
 While not making the circumstances prompting the search less exigent, the emergence of La Beet, Balantine and Joseph did support the agents' belief that the remaining suspects were present on the Hospital Street premises. The agents could reasonably assume that if three persons suspected of the same crimes were found together, the remaining participants in those crimes could very well be found on the same premises, and further, finding La Beet, Ballantine and Joseph at the Hospital Street address corroborated the informant's tip that the suspects were there. See Draper v. United States, 358 U.S. 307, 310-313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The search for the two Puerto Ricans, thus, took place in exigent circumstances and was supported by probable cause to believe the suspects were present. In the circumstances of this case, search of all three of the buildings clustered together was proper. The standard against which searches are measured is probable cause-- that standard indicates that less than a certainty is required, and probable cause may exist to believe that a suspect or object is in more than one location. Cf. Agnellino v. New Jersey, 493 F.2d 714, 726 (3d Cir. 1974); United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972). The number of buildings on the Hospital Street premises was not so great nor their spatial relationship to one another so attenuated that belief in the suspects' presence in any one of the buildings became unreasonable. We note that the search was limited in scope to that reasonably designed to locate persons, so the items found need not be suppressed as the products of a search not justified by the theory set forth above.[11]
 
 
 32
 The second search of the Hospital Street premises was made after issuance of a search warrant. Appellants challenge this search on three grounds, the first two of which mirror contentions we have rejected above. Defendants claim that the search warrant was obtained in part on the basis of items seen in the first search, and they argue that the asserted invalidity of the first search infected the second. We have held that the first, warrantless, search was lawful. All of the items seen by the agents during the course of that search, and used to support issuance of the warrant for the subsequent search, were in plain view to law enforcement officers engaged in the lawful execution of their duties. See, e.g., United States v. Novick,450 F.2d 1111, 1112-1113 (9th Cir. 1971). Defendants' second ground for challenging the district court's refusal to suppress evidence seized in the warranted search of 527 Hospital Street is that during the search the police located the machine gun used in the Fountain Valley killings only because cause police coerced La Beet, through inhumane treatment, to reveal where it was hidden. Defendants claim the machine gun should have been suppressed as the product of police brutality. We reject this argument because, as set forth above, defendants have failed to demonstrate error in the lower court's finding that no such brutality occurred.
 
 
 33
 The final ground for attacking the search is that it exceeded the scope of the warrant. The search warrant specifically describes each of the buildings to be searched and the nature of the items to be seized but fails expressly to mention the outhouse and machine gun. We think that the description in the warrant, authorizing search of 'the premises on Hospital Street described as 527 Hospital Street' and identifying the adjacent buildings as included within the warrant's authorization, was sufficiently precise and did not need to state separately that search of the outhouse located on the same property was authorized. Similarly, the description of 'rifles, shotguns, pistols . . .' should not be read over-literally as placing the machine gun beyond the warranted scope of the search-- the warrant makes clear that a number of weapons police believed were used in the killings were being sought. It would be unrealistic, particularly where so many weapons are involved, to demand more precise identification of the items to be seized. The warrant at issue here does not authorize a general search for evidence but lists various items, some by individual and some by generic descriptions, that police had seen or believed were on the premises. Absent any reason for requiring more particularity here, we hold that the warrant was sufficiently explicit in its description of the place to be searched and items to be seized and that the search and seizure did not exceed the warrant's authorization.
 
 II. SUFFICIENCY OF EVIDENCE
 
 34
 Before trial, Gereau moved to have the information against him dismissed. At the close of the Government's case, Smith moved for acquittal, and both Smith and Gereau moved for acquittal at the end of trial. The District Judge denied all four of these motions. Smith and Gereau contend that denial of these motions was error and that their convictions should be set aside because based on insufficient evidence.
 
 
 35
 In reviewing appeals from criminal convictions, we must view the evidence, and reasonable inferences therefrom in the light most favorable to the Government and sustain the conviction if there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Cades, 495 F.2d 1166, 1169 (3d Cir. 1974). Applying this standard, it is clear that Smith's and Gereau's convictions were based upon sufficient evidence. Smith and Gereau claim, not that the Government has failed to show specific acts attributable to each of the gunmen at Fountain Valley, but rather that the Government has not proved that they were among the gunmen, all of whom, according to the testimony at trial, committed the criminal acts charged. We, therefore, do not set forth the specific requirements of the crimes charged and the evidence of these defendants' specific acts, but simply summarize the evidence connecting Smith and Gereau to the Fountain Valley incident.
 
 
 36
 The Government produced a plethora of evidence against defendants La Beet, Ballantine, and Joseph, and linked the activities of Smith and Gereau at the time of the Fountain Valley killings to them. Tuitt testified that he had seen all five defendants together the night before and afternoon of the murders, that they were all dressed in fatigues of the sort worn by the Fountain Valley gunmen, and that he had overheard the defendants say they were 'going on a raid.' From the room Smith used at 160 Estate Grove Place, police took, among other things, a golf ball, a box of matches inscribed 'Fountain Valley Golf Course,' and bullets matching those used in the luger found on a nearby rooftop. Officers testified to the seizure of these items, which are attributable to Smith, cf. United States v. Bamberger, 456 F.2d 1119, 1134-1135 (3d Cir.), cert. denied, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972), and the items were submitted in evidence by the Government. In addition to Tuitt's testimony, Gereau was implicated in these crimes by his own statements. Certainly, from this evidence and inferences that reasonably could be drawn from it, the jury could find beyond a reasonable doubt that Smith and Gereau were among the participants in the Fountain Valley crimes with which they were charged.
 
 III. DISQUALIFICATION
 
 37
 All five defendants assert that the District Judge improperly failed to disqualify himself and erred in denying four motions by defendants for disqualification. At the outset, we must determine what law governs disqualification in the District Court of the Virgin Islands. The relevant federal disqualification provision, 28 U.S.C. 144 (1970), is made applicable to 'any proceeding in a district court.' The district courts are specifically enumerated, identified as 'United States District Courts' and their attributes set forth in the sections of the Judicial Code immediately preceeding the disqualification provision. 28 U.S.C. 81-143 (1970). The District Court of the Virgin Islands is not among the district courts enumerated in the Judicial Code but, instead, is created by the Revised Organic Act of the Virgin Islands, ch. 558, 21, 68 Stat. 506; it is given a different name and both the court and its judges possess attributes different from those of federal district courts and district judges. The mere appellation 'district court,' therefore, does not compel its inclusion within the scope of 144. See In re Webster, 382 F.2d 79 (9th Cir. 1969); Callwood v. Callwood, 127 F.Supp. 179 (D.V.I.1954). Since provisions of the Virgin Islands Code, specifically applicable to the Virgin Islands courts, also provide a mechanism for disqualification, there is even less basis for construing the federal disqualification provision to extend to the District Court of the Virgin Islands.
 
 
 38
 In testing the propriety of the challenged denials of disqualification motions, then, we shall look to 4 V.I.C. 284 and 286 (1967). Section 286 states that challenges to the competency of a judge are permissible only when his disqualification is clear, and provides that the objecting party in such case may file his written objection with the judge, who is allowed to pass on his own competency, subject only to review on appeal after final judgment. The grounds for disqualification are set forth in 284. The sole ground relevant here is the probability 'that, by reason of bias or prejudice of such judge, a fair and impartial trial cannot be had before him.' 4 V.I.C. 284(4) (1967). The procedural requirements of these sections are substantially less rigorous than those of 28 U.S.C. 144, see, e.g., Note, Disqualification of Judges for Bias in the Federal Courts, 79 Harv.L.Rev. 1435, 1441-45 (1966), and consequently it appears that a more persuasive showing of probable bias must be made under the Virgin Islands statute than under the federal law-- reading sections 284 and 286 together, we view the Virgin Islands Code as requiring the facts alleged by the party arguing disqualification to reflect a clear probability that the judge is biased against that party. The Government indicates a belief that the Virgin Islands statute permits a judge to consider the truth or falsity of the claim of bias made against him, but we find no support for this argument. The local provision concerning bias, as noted by the Reviser, was 'suggested by' the federal statute, which requires allegations to be taken as true. See United States v. Thompson, 483 F.2d 527, 528 (3d Cir. 1973). Further, were the challenged judge allowed to deny the validity of the charge against him, rather than simply weighing its legal effect, a full evidentiary hearing would be required to review effectively the denial of a disqualification motion. We, therefore, conclude that in applying the standard stated above, the district court must take the movant's factual allegations as true.
 
 
 39
 Applying these principles, we find no error in the District Judge's denial of defendants' disqualification motions. The first such motion was made under 28 U.S.C. 144, which we have held inapplicable here. The second motion, a day later, asked that the allegations of the first disqualification motion be treated as having been advanced under 4 V.I.C. 284 and 286 as well as 28 U.S.C. 144. The District Judge indicated that he had done so, and we shall treat the two motions together. The main contention of these motions was that the District Judge, Judge Young, had held an ex parte conference with prosecution attorneys.[12] Defendants aver that during this conference Judge Young expressed anger at the way in which a Government attorney was cross-examining a witness and asked that another attorney take over the examination.
 
 
 40
 Federal courts, uniformly have held that an ex parte meeting of the judge with one of the parties is not, of itself, a sufficient indication of bias or prejudice to warrant disqualification. E.g., United States v. Tropiano, 418 F.2d 1069, 1077 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970); Willenbring v. United States,306 F.2d 944, 946 (9th Cir. 1962). As we have indicated, the Virgin Islands provision requires that the facts alleged demonstrate the judge's probable bias with more clarity than is required under federal law. We cannot infer from the facts alleged by defendants that the ex parte communication with the Government was motivated by a desire to see the Government prevail on the merits. It is equally probable that Judge Young was concerned merely with the quality of the performance of all the attorneys before him and was attempting to ensure a presentation of the entire case that would not confuse or mislead the jury. Although we generally disapprove of such ex parte conferences, we conclude that Judge Young did not err in denying the first and second disqualification motions.
 
 
 41
 We need not pause long on defendants' third motion. That motion was made orally and thus failed to comply with the sole procedural requirement of 286. The provision's requirement of written objections is not a matter of merely technical importance. If allegations are to be taken as true, there must be some sanction available to deter parties from making patently false allegations, and it has long been believed that such sanctions are strengthened by requiring allegations to be in writing. See Berger v. United States, 255 U.S. 22, 33-36, 41 S.Ct. 230, 65 L.Ed. 481 (1921). Denial of the third motion was, therefore, proper.
 
 
 42
 The fourth motion for disqualification was made in writing after the trial had ended, the verdicts rendered and sentences imposed. Although in light of the time it was made the motion could not allege facts strictly within 284's ground for disqualification that 'a fair and impartial trial cannot be had before (the judge),' we shall, nonetheless, consider the last disqualification because a motion for new trial was then pending before Judge Young. We cannot read 284 so narrowly as to make a judge's bias irrelevant to his ruling on a new trial for defendants.
 
 
 43
 The fourth disqualification motion alleged that Judge Young had caused a letter to him from a Baltimore City judge to be published in the St. Croix Avis. This letter, according to defendants, commented unfavorably on the actions taken in another case by two of defendants' counsel. This allegation, like those of the first and second motions, fails to show the clear probability of bias required by sections 284 and 286. The letter itself was merely an expression of another person's opinion about defense counsel. There is no claim that any opinion or statements about defendants' attorneys were made by Judge Young, nor is there any claim that Judge Young acquiesced in or agreed with any statements made in the letter. We cannot infer such agreement with the probability required by Virgin Islands law merely from the publication of the letter, even if caused by Judge Young.[13]
 
 
 44
 In addition to the grounds asserted in their motions for disqualification which we hold were properly denied, defendants in their brief discuss numerous points that they claim support their argument that Judge Young should have disqualified himself. Only those matters set forth in writing as the bases for disqualification motions are, however, properly before us. See Green v. Murphy, 259 F.2d 591, 593 (3d Cir. 1958). We note, nonetheless, that a close relationship exists between demands for disqualification and allegations that a judge's bias, appearing during the course of proceedings, deprived defendants of a fair trial. Certainly the requirement of a fair and impartial tribunal, which is a basic requirement of due process, e.g., In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), underlies both claims, and we should not ignore arguments manifestly relevant to one of these complaints because made incorrectly in the name of the other. In this case, however, we find nothing in the argument advanced by defendants to support their contentions on disqualification indicating that defendants did not receive a fair trial. Their claims run, not to prejudicial conduct by the judge below, but to words and actions irrelevant to the impartiality of the proceeding proper which defendants believe demonstrate appropriate grounds for disqualification. All of defendants' challenges to specific rulings by Judge Young before, during and after the trial are set apart from their claims of bias. Having found no error in denial of the motions to disqualify Judge Young for bias, we turn to the asserted legal errors in other rulings.
 
 IV. RULINGS BEFORE AND DURING TRIAL
 Juror Torres
 
 45
 Beyond the issues dealt with above, defendants challenge only three of Judge Young's rulings rendered prior to delivery of the jury's verdict. The first of these rulings was that a juror, Mrs. Torres, should not be excused for cause. The cause claimed by defendants to require excusing Mrs. Torres is her relationship to a prosecution witness. Mrs. Torres is the divorced wife of a police officer who testified at trial. They had been divorced for seven years but still saw each other occasionally, although apparently these meetings were infrequent and related only to the care of their child. The child lived with Mrs. Torres. Her husband contributed to the child's support.
 
 
 46
 In assessing a challenge to a juror's competency, such as that advanced here, the question to be resolved by the trial court is not whether a prior connection exists between the juror and a prospective witness but whether that connection is likely to affect the juror's decision, given the nature of the connection and the witness' relation to the case. See Kelly v. Gulf Oil Corp., 28 F.Supp. 205, 207 (E.D.Pa.1938), aff'd, 105 F.2d 1018 (3d Cir. 1939) (adopting opinion below). While at common law certain relations between jurors and others resulted in a legal conclusion of partiality, the relationship of a juror to a witness was not among them. See, e.g., McCarten v. Connecticut Co., 103 Conn. 537, 131 A. 505, 508 (1925). The trial judge, in determining whether a juror is likely to be biased, has the benefit of observing the juror during voir dire as well as evaluating the juror's answers. For this reason, the Supreme Court has recognized that 'the trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges therefor.' Dennis v. United States, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950). It is the rule of this Circuit that the trial court's determination as to a juror's actual bias will be reversed only for a manifest abuse of discretion. Government of the Virgin Islands v. Williams, 476 F.2d 771, 775 (3d Cir. 1973). We find no such abuse here.
 
 
 47
 The court below found that Mrs. Torres' husband would not be a critical witness and that Mrs. Torres would not be influenced by the fact that her husband appeared as a witness for the Government. Contrary to defendants' contentions, it appears clear that Detective Torres, whose testimony is almost entirely cumulative, was not a critical witness, and neither the fact of Mrs. Torres' former marriage to the detective nor her answers on voir dire mandate reversal of the District Judge's ruling. Defendants claim that, as a matter of logic, Mrs. Torres' admission that she receives child-support payments from her ex-husband is sufficient cause to excuse her: any divorcee with some financial dependence on her former husband will, defendants assert, vote for the verdict her ex-husband's testimony would support. Viewed in the light of common experience, which discloses feelings of enmity as often as expressions of financial concern among persons situated similarly to Mrs. Torres, we find defendants' argument unpersuasive and certainly not evidence of a manifest abuse of discretion in this case.
 
 Voluntariness Instruction
 
 48
 Defendants next challenge the instruction of the district court regarding consideration of the defendants' confessions. The portion of the charge to which objection is taken states:
 
 
 49
 The jury may consider evidence as to the voluntariness of the confessions which have been admitted into evidence, and then give the confessions such weight as you believe they deserve under all the circumstances. If you decide that one or more, or all of these confessions which have been admitted into evidence are entitled to no weight, because you find that they have been obtained as a result of brutalities practiced upon the defendants concerned then you may disregard them totally.
 
 
 50
 Defendants contend that this charge allows the jury to consider and give weight to a confession it finds to be involuntary. It is clear, at least since Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that a confession cannot be considered as evidence against a criminal defendant absent a determination, after an appropriate hearing, that the confession was given voluntarily. Id. at 376, 84 S.Ct. 1774. There is, however, no impropriety in having a judicial determination of a confession's voluntariness and permitting jurors to decide what weight is appropriate. See Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Congress mandated this practice in enacting 18 U.S.C. 3501 (1970), and the Supreme Court has approved it, noting that, while the judge determines the voluntariness of a confession for purposes of admissibility, '(a) defendant has been as free since Jackson as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness. In like measure, of course, juries have been at liberty to disregard confessions that are insufficiently corroborated or otherwise deemed unworthy of belief.' Lego v. Twomey, supra at 485-486, 92 S.Ct. at 625.
 
 
 51
 Having determined before trial and after a full evidentiary hearing that the confessions were voluntary, the District Judge followed the mandate of 3501 in allowing evidence concerning the confessions' voluntariness to be presented to the jury and in leaving to the jury the weight to be given the confession. See 18 U.S.C. 3501(a) (1970). This practice does not share the vice attacked in Jackson of allowing a confession to be introduced, and hence almost assuredly given some weight, although the court did not first decide that it was given voluntarily. Further, the remainder of the charge given below dictates that if the jury found that defendants' confessions were not voluntary, it was required to disregard them. It seems probable from the entirety of the charge given in this case that the jury employed the standard argued for by defendants, and the portion of the charge attacked, while it may have led the jury to assign a different weight to the confessions, comports with the requirements of 3501 and with those of due process as interpreted by the Supreme Court.
 
 Continuing Deliberations
 
 52
 Finally, defendants contend that the district court improperly instructed the jurors to continue deliberations when they indicated that an impasse had been reached. After ten hours of deliberation, the jury asked whether their verdict needed to be unanimous and how long they had to stay. The Court's response to these queries, not reproduced in the record, is not challenged here. Three days later, the jurors asked to have certain testimony read to them and on August 11, 1973, two days following this request, the jury informed the judge that it was unable to reach a unanimous verdict and asked, 'What happens next?' The jury at that point had deliberated for thirty-nine and one-half hours. The District Judge instructed the jurors that although they need not reach a verdict and could continue to disagree, this was an important case and the jurors should try to reach a verdict if they could. The jurors were instructed to continue deliberations the afternoon of August 11 and, if they desired, the next afternoon. Judge Young stated that further action would be considered on August 13 if no verdict had been reached. The jury arrived at unanimous verdicts on August 12.
 
 
 53
 How long jury deliberations should continue is a matter entrusted to the discretion of the trial judge. United States v. Grosso,358 F.2d 154, 159 (3d Cir. 1966), rev'd on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), and cases cited therein 358 F.2d at 159-160. Absent peculiar evidence indicative of coercion, it is proper for a judge to instruct a deadlocked jury to continue deliberations and attempt to arrive at a verdict. United States v. Alper, 449 F.2d 1223, 1233-1234 (3d Cir. 1971). There is no indication here that the charge itself was coercive, unlike the 'Allen charge' we disapproved in United States v. Fioravanti, 412 F.2d 407, 414-420 (3d Cir. 1969), which instructed jurors to distrust their own judgment if it conflicted with other jurors'. The charge here is simply a statement that jurors were not required to reach a verdict but should try to do so. It required only one additional afternoon of deliberation unless the jury felt a second afternoon would be beneficial; there was no threat that the jury would be locked up indefinitely unless a verdict was reached, nor was there any indication that jurors should doubt the judgments they had arrived at independently.
 
 
 54
 Defendants argue, however, that the instruction was coercive in light of the long hours the jury had already deliberated and its two prior communications with the court. The hours deliberated, while long, were not so great as to make any court-ordered continuation of deliberations an abuse of discretion. And the prior communications were not, as defendants contend, indications of deadlock. We conclude that defendants have failed to show that the District Judge abused his discretion by ordering the jury to continue deliberations.
 
 V. SENTENCING AND NEW TRIAL
 
 55
 Thirty minutes after the verdicts were returned and the jury polled, Judge Young reconvened court and imposed sentences on the defendants. No pre-sentence report was utilized, but each defendant was asked if he wished to offer anything in mitigation. Defendants contend that the court abused its discretion in failing to utilize presentence reports as authorized by Rule 32 of the Federal Rules of Criminal Procedure. Although many courts have noted the benefits of pre-sentence reports and encouraged their use, e.g., United States v. Warren, 453 F.2d 738, 743 (2d Cir. 1973); United States v. Hazelrigg, 430 F.2d 580, 582-583 (8th Cir. 1970), Rule 32 does not require their use. We are fully persuaded that absent unusual circumstances judges should avail themselves of these reports to aid in sentencing and should state their reasons for not doing so when they dispense with the reports. The court below did neither.
 
 
 56
 Defendants' burden on appeal, however, is to persuade us not that the District Judge followed a disfavored course but that he abused his discretion. See United States v. Williams, 254 F.2d 253 (3d Cir. 1958). Defendants here did not ask the court to delay sentencing pending preparation of pre-sentence reports, nor did they choose, when asked by the court, to make any statement in mitigation of their offenses. Likewise, defendants did not request that sentencing be deferred until they could put mitigating evidence before the court. In these circumstances, we are unable to find an abuse of the district court's discretion.
 
 
 57
 The final contentions advanced by the defendants concern their motion for a new trial. Defendants claim that the verdicts here were influenced by various improper communications with jurors. This claim, which defendants spell out in considerable detail, formed the basis of their motion for a new trial. Defendants asked for a hearing on their 'jurytampering' allegations at a time when Judge Young was off the island and Chief Judge Christian of the District Court was involved in another trial. Government and defense attorneys consented to the appointment of a municipal judge, Judge Marsh, by Chief Judge Christian to preside over the hearing. The understanding of the parties apparently was that the testimony would be sealed and turned over to Judge Young to make findings and rule on the motion on his return.
 
 
 58
 Judge Marsh, however, entered findings of his own which Judge Young reviewed by a clearly erroneous standard. These findings are vital to a decision of the new trial motion, and defendants challenge reliance on Judge Marsh's findings as violative of their understanding with Judge Christian. They also argue that the use of findings by Judge Marsh violates federal law. 28 U.S.C. 455 (1970) provides that a judge shall disqualify himself in any case when he has been a material witness. This section is expressly made applicable to proceedings in the District Court of the Virgin Islands. 28 U.S.C. 460 (1970). Because Judge Marsh was a material witness for the Government at the suppression hearing in this case, testifying to matters relevant to the admissibility of defendants' statements (the treatment of defendants, their appearance and statements by them at their presentment before him), defendants contend that Judge Marsh was disqualified from making any findings in this case or otherwise participating in it in his judicial capacity except to the limited extent of defendants' consent.
 
 
 59
 The Government advances no substantial argument to counter defendants' contention, but instead claims that any error here was harmless. The Government urges us to find that Judge Young really afforded defendants de novo review on each key finding, despite the explicit statement in his opinion denying defendants' motion for a new trial that he was using a 'clearly erroneous' standard to review Judge Marsh's findings. A fair reading of Judge Young's decision does not, however, convince us that a standard was used other than that Judge Young purported to apply. It is clear that Judge Marsh's entry of findings violated 455 of the Judicial Code, and the Government has not satisfied its burden of proving this error harmless. See Chapman v. California, 386 U.S. 18, 21-26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We hold that before ruling on defendants' motion for new trial, Judge Young must review the record of the hearing on such motion de novo and enter findings without reliance on those made by Judge Marsh.[14]
 
 
 60
 In addition to the contentions discussed above, defendants advanced several claims for the first time at oral argument. Apart from defendants' tardiness in asserting these claims, findings necessary to provide the factual predicate for their resolution were neither sought nor made below. Further treatment of these claims, therefore, is unnecessary.
 
 
 61
 The order of the District Court denying defendants' motion for new trial will be vacated and the matter remanded to the District Court for further proceedings in accordance with this opinion.[15] The judgment of the District Court will be affirmed subject to the District Court's ruling, on remand, on defendants' motion for new trial.
 
 
 
 [1]
 The provisions of the Virgin Islands Code defining these offenses are 14 V.I.C. 295 (1964) (assault), 14 V.I.C. 922 (1964) (murder), 14 V.I.C. 1861 (1964) (robbery). Trial was pursuant to an information filed by the United States Attorney for the Virgin Islands, as authorized by 3 of the Organic Act, as revised by the Act of August 23, 1968, Pub.L. 90-496, 11, 82 Stat. 841
 
 
 [2]
 The District Court also suppressed weapons found as a result of Joseph's statement
 
 
 [3]
 Several such claims that the district court improperly determined witnesses' credibility or incredibility form the basis for defendants' contention that the District Judge erred in refusing to grant their renewed motion to suppress. We reject this contention for the reasons given above in sustaining the District Judge's credibility findings
 
 
 [4]
 The Federal Rules of Criminal Procedure are made applicable to proceedings in the District Court of the Virgin Islands by Rule 54(a)
 
 
 [5]
 While the Federal Rules' provision regarding presentation before a magistrate is 'procedural,' unlike the 'substantive' rule of 3501, the sanction imposed by federal courts for failure to comply with Rule 5(a) is suppression of statements taken during the period of 'unnecessary delay.' Since 3501 regulates suppression of such statements, it should be viewed as amending the meaning of 'unnecessary delay' as used in Rule 5(a), rather than leaving that term's meaning unchanged and simply allowing the Rule to be violated without sanction
 
 
 [6]
 In Amador-Gonzalez, reversing defendant's conviction for narcotics possession, the Fifth Circuit held that a statement given by defendant should have been suppressed. The ground for requiring suppression, however, was that the statement was the fruit not of defendant's pretextual arrest for a minor traffic violation but of the search incident to that arrest and for the purpose of which the arrest was made. 391 F.2d at 318. No search is justified here as incident to an arrest challenged by defendants as a 'pretext' arrest
 
 
 [7]
 The Fourth Amendment to the Constitution is made applicable to the Virgin Islands by 3 of the Organic Act of 1954, as revised by Act of August 23, 1968, Pub.L. 90-496, 11, 82 Stat. 841, and by 48 U.S.C. 1406g (1970)
 
 
 [8]
 We note that the Government had the burden of proving by a preponderance of the evidence that Tuitt possessed the requisite authority. United States v. Matlock, 415 U.S. 164, at 176-178, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The trial court correctly concluded that the Government sustained its burden
 
 
 [9]
 While courts sometimes speak only in terms of the knowledge of the arresting officer, we are in fact concerned with the knowledge possessed, at the time of the search, by both the arresting and authorizing officers. Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); United States v. Bianco, 189 F.2d 716, 719 (3d Cir. 1951). We therefore do not direct our attention only to the knowledge possessed by the arresting officers
 
 
 [10]
 Defendants claim additionally that the search was tainted because the warrants for the two Puerto Ricans were defective. Contrary to defendants' contention, the warrants did not fail to specifically describe the persons to be arrested. Reasonably complete physical descriptions were provided along with the suspects' first names. Failure to give a suspect's last name does not automatically invalidate an arrest warrant. United States v. Ferrone, 438 F.2d 381, 389 (3d Cir.), cert. denied, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971). Defendants further intimate that these warrants were used by police and F.B.I. agents merely as an excuse to search, although they knew these suspects were non-existent. We find no support for this claim in the record
 
 
 [11]
 We note also that the buildings involved here were small dwellings, not large buildings containing numerous apartments or other separate living quarters
 
 
 [12]
 Defendants' first disqualification motion alleged other grounds of bias. We have considered these additional allegations and, finding them far short of the type necessary to show clear disqualification, deem it unnecessary to discuss them separately
 
 
 [13]
 While we are bound by the factual allegations of defendants' motion, we note that Judge Young denied having caused the letter to be published or having acquiesced in the letter's publication
 
 
 [14]
 Defendants also contend that we should appoint a judge other than Judge Young to enter new findings because Judge Young has previously entered findings and, implicitly, will feel bound by them. We find no legal basis for disqualifying Judge Young and cannot assume that on remand Judge Young will not apply proper standards for de novo fact-finding. On remand, Judge Young may decide that he cannot enter appropriate findings without a new hearing and the opportunity to observe witnesses and assess the credibility of those giving conflicting testimony. Nothing in this opinion should be viewed as limiting Judge Young's authority to order a second hearing on defendants' motion for a new trial, nor do we decide that such a hearing is required
 
 
 [15]
 Defendants have made four motions to augment the record. The first, second and fourth of these will be denied. The third motion to augment is moot, in light of our decision on defendants' contention regarding new trial