**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard A. SCHMIDT,
Defendant-Appellant.**

**No. 77–1334.**

United States Court of Appeals,
Ninth Circuit.

Feb. 6, 1978.

As Amended on Denial of Rehearing and
Rehearing En Banc April 24, 1978.

---

1058

Thomas H. S. Brucker, Seattle, Wash., for defendant-appellant.

Donald M. Currie, Asst. U. S. Atty., Tacoma, Wash., for plaintiff-appellee.

Before CARTER and HUFSTEDLER, Circuit Judges, and SMITH,* District Judge.

JAMES M. CARTER, Circuit Judge:

This is an appeal by Richard A. Schmidt of his conviction under a two count indictment for importation and conspiracy to import cocaine into the United States in violation of 21 U.S.C. §§ 952 and 963, respectively. Schmidt waived his right to a jury and following trial was found by the district judge to be guilty on both counts. He was sentenced to five years imprisonment on each count, the sentences to run concurrently.

Schmidt states three grounds upon which he contends his conviction should be reversed. First, statements made to DEA agents in Peru were allegedly improperly admitted because they were the result of coercive conduct by the Peruvian government. Second, the physical evidence presented at trial is claimed to be the inadmissible product of the coerced statements. Third, the United States government is alleged to have prevented the defense from investigating the crime in Peru. None of these contentions is meritorious. We *affirm*.

## I. FACTS

Appellant Richard A. Schmidt and James Hooker conspired to illegally import approximately five pounds of cocaine from Lima, Peru to Tacoma, Washington. Pursuant to this plan, on the evening of January 6, 1976, Schmidt scuba-dived underneath the freighter "Santa Mercedes" which was moored in the Callao Harbor, Lima, Peru. He attached a metal canister containing the cocaine to the rolling chock of the ship. The ship was leaving that evening for Tacoma.

When he surfaced Schmidt was spotted by Peruvian military guards. Since he was in a restricted area the guards suspected him of espionage or sabotage and after a chase apprehended him. Although the departure of the Santa Mercedes was delayed shortly because of the commotion in the harbor, the ship received clearance and left on route to Tacoma before the Peruvian military could search its hull.

Schmidt was interrogated immediately by the Peruvian navy intelligence police. He had no clothes because he had worn only his wetsuit to dive. He was given a blanket. Schmidt then told the authorities that Commander Petrozzi, a Peruvian military officer, could vouch for him and the commander was summoned. Upon arrival Commander Petrozzi offered his assistance to Schmidt and arranged for Schmidt to be escorted to find his clothes on the beach where he had left them.

At the beach the authorities discovered not only Schmidt's clothing, but also James Hooker who was hiding in the rocks nearby. Hooker had taken Schmidt to the restricted area of Callao Harbor earlier that evening in a rubber boat. When Schmidt was being chased by the harbor guards Hooker was observed to flee the harbor in the rubber boat. Apparently he was waiting in the rocks to see if Schmidt would return. Hooker was taken into custody. Schmidt's clothing disappeared unexplainedly, thought by Schmidt to be stolen by some of his guards. He was given other clothes the next day.

A search of the area near where Hooker was caught revealed a car which contained, among other items, Hooker's passport, some rubber tubing, a motor and a rubber boat. The boat was later determined to have been purchased by Richard Schmidt in Seattle, Washington in December, 1975, under an assumed name.

Other important physical evidence was uncovered by the Peruvian authorities dur-

* Hon. Russell E. Smith, Chief United States District Judge, District of Montana, sitting by designation.

ing their investigation. In James Hooker's apartment a metal canister with gaskets and a clear plastic plate which sealed its top were found. A search of the apartment of James Hooker's father, Cecil Hooker, uncovered Richard Schmidt's passport.[1]

Schmidt was abusively interrogated by the Peruvian naval authorities. For the first few days he resisted interrogations at which he was slapped and hit for refusing to answer questions.[2] Finally, however, after a nighttime interrogation at which he was again slapped and hit and repeatedly had his head dunked in a bucket of water, Schmidt confessed his participation in the cocaine smuggling conspiracy. Throughout the entire ordeal Schmidt asked to see either an attorney or a representative of the American Embassy, but was refused. Once he had confessed Schmidt was returned to his cell, but within a few days he became ill, unable to eat, and was transferred to a hospital for treatment. About a week had elapsed since Schmidt's capture.

At the hospital custody over Schmidt was conveyed by the navy to the narcotics division of the Peruvian Investigative Police (PIP). Officials of the PIP attempted to obtain a second confession from Schmidt while he was still in the hospital, but Schmidt refused to cooperate. After a two-day recovery period at the hospital Schmidt was removed to the prison at PIP headquarters.

The PIP interviewed Schmidt frequently over the next week, at all times of day or night, attempting to corroborate the statements he had made to the naval officials. Again Schmidt was slapped and hit for refusing to cooperate, but continued to insist on seeing an attorney or a representative of the U.S. Embassy. Although his later testimony is inconclusive, apparently Schmidt repeated some of his earlier admissions, but refused to fully corroborate the coerced confession. Nevertheless, based mostly on the information extracted from Schmidt by the Peruvian navy, the PIP typed up a complete statement and made Schmidt sign it. Schmidt refused to sign until he feared another dunking session. Even then he withheld his signature until he was permitted to append the words "forced signature" to two of the three pages of the document.[3]

On January 16, 1976, during his confinement at PIP headquarters but before he had been forced to sign the statement, Schmidt was visited by two American agents of the Drug Enforcement Administration (DEA). The agents were attempting to ascertain whether the attempt to smuggle cocaine into the United States had been successful and whether any still undisclosed persons had been involved. They first advised Schmidt of his *Miranda* rights which he said he understood. Then Schmidt admitted his own participation in the conspiracy but refused to implicate any others until he was returned to the United States.

One or two subsequent meetings were held between agents of the DEA and

1. Cecil Hooker went to Peru to assist his son after hearing of the arrests. While in Lima he was suspected of assisting an escape from the PIP prison and was confined for about nine days. During his incarceration Cecil Hooker led PIP officers to his apartment at which they found Richard Schmidt's passport.

2. On the second night of his imprisonment Schmidt made a nearly successful escape attempt. He sneaked free of the navy confines and made his way to the ocean, but was recaptured while attempting to swim to a tuna boat offshore. Part of the beating he received resulted from this incident.

3. Schmidt signed "forced signature" on the first page of the document before it was detected. After he had begun to write it on the second page he was stopped and a violent argument ensued. The Peruvian authorities were outraged and threatened Schmidt with physical abuse if he insisted on signing "forced signature". Schmidt argued, reiterating his claimed right to an attorney. He testified:

> ". . . they knew that I had had about as much as I could get from them except the dunking treatment, and I just told them I'm not going to sign, I don't care what you do to me, I'm not going to sign it.
>
> \* \* \* \* \* \*
>
> "Okay, now, you see, they allowed me to sign the last page 'forced signature' because I said I wasn't going to sign, I simply wasn't going to sign it . . ." R.T. 274–75.

Schmidt, but at these meetings Schmidt was less willing to discuss even his own involvement. His only further admission occurred when he was criticized for placing the canister on a dangerous part of the ship. Schmidt expressed that he had not intended to endanger anyone by doing so.

The Santa Mercedes arrived on schedule in Tacoma, Washington on January 23, 1976. DEA divers found a metal cylinder identical to the one discovered in Hooker's apartment in Peru attached to the rolling chock of the ship. The cylinder's contents were analyzed and found to contain 85 ounces (approximately 2.4 kilograms or 5.3 pounds) of 70% pure cocaine with an estimated street value of over $340,000. The cocaine was wrapped in a plastic bag and sealed with surgical tubing like that found in Hooker's car at the beach in Peru.

On February 5, 1976, Schmidt escaped from prison in Peru. Four days later charges were filed against him in the United States. He was subsequently arrested in Seattle on June 11, 1976.

One week prior to trial, counsel for Schmidt sent an attorney, Jeffrey Steinborn, to Lima to investigate the case and take depositions. Steinborn intended to depose all the military personnel in Peru who had participated in the capture or interrogation of Schmidt. In addition he intended to depose several Peruvian lawyers and a reverend who knew of conditions in Peruvian jails.

Upon arrival in Lima, Steinborn was intimidated by what he called the "state of marshal law" existing in Peru.[4] He distrusted not only the Peruvian officials, but also the United States officials stationed in Peru, contending that the officials of both countries were seeking to frustrate his investigation. Ultimately Steinborn returned to Seattle having been unable to obtain any depositions.

Schmidt moved to dismiss the indictment because the U.S. government allegedly interfered with the defense investigation in Peru. He also moved to suppress all statements, both oral and written, made to either Peruvian or American authorities in Peru. After a pretrial hearing the trial court found the United States representatives had not interfered with the investigation. The oral and written statements made to the Peruvian naval authorities and the PIP were suppressed as involuntary, but Schmidt's statements to the American DEA agents were found voluntary and admitted.

At trial Schmidt denied making any incriminating admissions to the DEA in Peru. However, the trial judge made a factual finding that the admissions were made and reaffirmed his determination that they were voluntary. The physical evidence produced by the investigation of the Peruvian officials was admitted over the objection that it was tainted fruit of the illegal confession. Schmidt was convicted by the court sitting without a jury.

## II. ISSUES

A. Could the trial court reasonably conclude that Schmidt's statements to the American DEA agents in Peru were voluntary?

4. Steinborn learned of the conditions in Peru both from the U.S. Embassy and from his personal observations. He explained his concerns after being warned to be cautious by the Consul General:

"I was really pretty frightened by this, was quite alarmed by it, partly by what he said and partly by the way he said it, and partly by my observations of the condition of things in Peru, which was that they have a sort of a military government down there and they have declared a state of marshal law, which means that all hours of the day there are soldiers everywhere on all the streets, on the freeways, on the bridges, with automatic weapons, and at 1:00 o'clock they begin a curfew, exactly at 1:00 o'clock at night, and the rifles start going off. You can hear the gunshots from the Sheraton, and about 1:15 the tanks, well, they are really armored personnel carriers, they don't have the swiveling turret with the cannons on them, but the metal treaded tanks start rolling down the streets, and it's really quite intimidating to see—if you are from America and you haven't seen that sort of thing before." R.T. 121–22.

B. Was the physical evidence of the crime inadmissible as the product of the coerced confession obtained by the Peruvians?

C. Was the trial court's finding that the United States government in Peru did not interfere with the defense investigation clearly erroneous?

### III. DISCUSSION

A. *Admissibility of the Statements made to DEA Agents.*

When a statement is claimed to be inadmissible as the product of a prior coerced confession the issue is solely one of voluntariness. The fact that an admission was once coerced does not by itself automatically taint any future admissions. The Supreme Court explained:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *United States v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1946).

See *Tanner v. Vincent*, 541 F.2d 932, 936–37 (2 Cir. 1976), *cert. denied*, 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977); *United States v. Toral*, 536 F.2d 893, 896 (9 Cir. 1976); *Knott v. Howard*, 511 F.2d 1060 (1 Cir. 1975); *United States v. Shea*, 436 F.2d 740 (9 Cir. 1970); *United States v. Knight*, 395 F.2d 971 (2 Cir. 1968), *cert. denied*, 395 U.S. 930, 89 S.Ct. 1776, 23 L.Ed.2d 249 (1969); *Cotton v. United States*, 371 F.2d 385, 393 (9 Cir. 1967).

Accordingly the inquiry must focus on whether the conditions which caused the first inadmissible admission also caused the later admission. This depends on

". . . the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances. *Lisenba v. California*, 314 U.S. 219, 240, 62 S.Ct. 280, 86 L.Ed. 166. The voluntariness or involuntariness of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess or deny a suspected participation in a crime." *Lyons v. Oklahoma*, 322 U.S. 596, 602, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481 (1944). By necessity this test requires an *ad hoc* determination based on the totality of the particular circumstances of each case.

■ This determination is primarily the responsibility of the trial court. *Brulay v. United States*, 383 F.2d 345, 349 (9 Cir. 1967), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967). Although on appeal we will closely scrutinize the findings of trial judges and juries regarding the ultimate issue of voluntariness of confessions, their decisions on the basis of disputed facts must be upheld unless they are clearly erroneous. *United States v. Curtis*, 562 F.2d 1153, 1154 (9th Cir. 1977); *United States v. Cluchette*, 465 F.2d 749, 754 (9th Cir. 1972).

Specifically we must determine whether the trial court could reasonably conclude that the oppressive treatment given Schmidt by the Peruvian authorities did not cause his subsequent willingness to make limited admissions to the American DEA agents. From this perspective it is evident that different inferences can be drawn fairly from the facts and the trial judge's decision to infer that the admissions to the DEA were voluntary is controlling.

■ Furthermore, our review of the record convinces us that the trial court's inference was correct. Schmidt's statement to the DEA agents was the result of his own free will. Similarly, the existence of the confession itself did not cause Schmidt to forgo the assertion of his constitutional rights.

The defendant would have us conclude that because the DEA and the PIP occasionally shared information on cases of importance to both and because the United States has given financial assistance to the PIP through the DEA to assist in the control of drug traffic to the United States, the investigation in this case was a "joint" operation. The trial transcript does not bear this contention out. Rather it is evident from the record that each agency—the DEA and the PIP—undertook essentially separate investigations. The minimal interaction that did occur cannot support the contention that the conduct of the PIP should be attributed to the American DEA on an agency rationale.

Schmidt is shown by the record to be an extremely strong-willed individual. Upon his capture by a foreign power and his incarceration in deplorable conditions he staged a nearly successful escape attempt within one day. Subjected to very abusive treatment by the Peruvians, Schmidt continually refused to respond to questions and demanded his rights under American law. Only after a coercive, all-night interrogation session did he confess. Even then, when faced with renewed attempts to elicit incriminating statements by a different arm of the Peruvian government, Schmidt refused to repeat his confession. Not until faced with what he thought would be a second exposure to the dunking treatment did he agree to sign the typed confession. At the conclusion of this entire ordeal, when Schmidt was being forced to sign the papers, he still asserted his will by including the words "forced signature". Speaking of this event, Schmidt testified at trial, ". . . I was still there and I was still—still had the capacity to resist." R.T. 274. This record of continual defiance belies the notion that Schmidt had lost his will to resist.

More importantly, however, the circumstances of the DEA interrogation of Schmidt show that neither the earlier coercive treatment he received from the Peruvian government nor the existence of the prior confession itself can be properly considered the cause of his choice to reveal to the Americans the general details of his part in the criminal scheme. Schmidt testified at trial that the agents were honest and friendly and that he was not intimidated by them. R.T. 290–304. Although he denied making any incriminating admissions, Schmidt admitted that any statements he did make were not coerced.[5] R.T. 315.

A critical distinction between the conditions which gave rise to the coerced confession and those in which Schmidt chose to talk to the DEA relates to the sovereign law which controlled the interrogation. In the earlier interrogations Schmidt was subject to the protection or lack of protection provided by Peruvian law. In the latter interrogation by the DEA Schmidt was protected by American law, specifically the

---

5. Schmidt testified:

"Q Did you feel intimidated by Chuck Hamm [One of the DEA agents]?
"A No.
"Q Did you feel intimidated by Mike Garland [another of the DEA agents]?
"A No.
"Q Did you feel intimidated by Bill Boggs [another of the DEA agents]?
"A Only by his size, not by his appearance or his manner, no. Oh, he did get—he called me some names and so forth at one point, but I didn't think he would—I mean it wasn't —I mean I had been intimidated so severely that I wasn't worried about Boggs in any name calling or any of this business about give me a night in the cell with him, although I wouldn't like to have had it happen. It wasn't as close to the reality of what I had been through, what I knew that the other people would do and did do for fun, if for nothing else."

NOON LUNCH BREAK

\* \* \* \* \* \*

"Q I think you indicated, Mr. Schmidt, just before lunch that you didn't feel intimidated by any of the DEA agents when they were interviewing you, isn't that true?
"A I said that I did feel intimidated, and I explained the degree. I had been through tremendous intimidation and I explained to you what intimidation I felt from them.
"Q You couldn't characterize any statements that you gave to the DEA agents as coerced statements, could you?
"A No, I gave those statements." R.T. 303–315.

United States Constitution. *Schmidt recognized this distinction.* At trial when he testified about the DEA interrogation he admitted:

". . . I knew some time, somebody from the United States was going to be talking to me and they are going to be asking me the same questions that I had been asked for twelve days now, and I knew what I—that I didn't want to say anything to anybody, *and although I couldn't stop from saying anything to the Peruvians because of the methods they used, I figured that with the same—the same thing couldn't be done to me by anybody from the United States . .*"
R.T. 558–59 (Emphasis added).

Schmidt knew he would not be subjected to any oppressive treatment by the DEA agents.

Furthermore, Schmidt knew he had the constitutional right to refuse to talk to the Americans and he had the right to an attorney before he permitted them to interrogate him. He had been trained for two years in competent American law schools.[6] During that training he took at least one course on criminal law. Additionally, the agents informed him of his *Miranda* rights in detail each time they met with him.[7] That he was well aware of his *Miranda* rights is further attested by Schmidt's repeated attempts to convince his Peruvian interrogators to afford him these rights as an American citizen.

Also, Schmidt knew his prior confession to the Peruvian naval authorities and the

forced signature on the statement prepared by the PIP were inadmissible in any American prosecution. His legal training was more than adequate to impute this knowledge to him. The *Miranda* warnings he received also carry the implicit statement of this fact.

Finally, Schmidt's own conduct at the DEA interrogation suggests the voluntariness of his decision to give a statement. After willingly discussing his own part in the conspiracy he chose to assert his *Miranda* rights and refused to further implicate any other persons until he was returned to the United States. At subsequent meetings Schmidt refused even to discuss his own involvement in the crime.

Schmidt had not lost his will to resist. He did not fear coercive treatment by the American DEA agents. He knew well his constitutional rights to remain silent and to have an attorney present at questioning. He even chose at one point to assert his right to remain silent. He knew his prior confession and the forced signature could not be used against him in an American prosecution. The totality of the circumstances strongly support the trial court's finding that Schmidt's limited statement to the DEA was freely made. It was not the product of the earlier abusive treatment by the Peruvian government or of the coerced confession itself.

B. *Admissibility of the Physical Evidence.*

The government's proof at trial included the rubber boat, surgical tubing and Hook-

---

**6.** In 1966 and 1967 the defendant completed two years of law school. He attended two law schools—the University of San Diego and Hastings law school in San Francisco.

**7.** Schmidt was told by agent Hamm:

". . . 'Before we ask you any questions, it's my duty to advise you of your rights. Do you understand that you have the right to remain silent?

"Do you understand that anything that you say can and will be used against you in court or other proceedings?

"Do you understand that you have the right to talk to a lawyer before we ask you any questions and to have him with you during the questioning?

"If you cannot afford or otherwise obtain a lawyer and you want one, a lawyer will be appointed to you by the U.S. Magistrate or the court and we will not ask you any questions until he has been appointed.

"If you decide to answer now with or without a lawyer, you still have the right to stop the questioning at any time or stop the questioning for the purpose of consulting a lawyer. However, you may waive the right to advice of counsel and your right to remain silent and you may answer questions or make a statement without consulting a lawyer, if you desire.' " R.T. 74–75.

Schmidt stated he understood these rights.

er's passport found in the car on the beach, the metal canister found in James Hooker's apartment, Richard Schmidt's passport found in Cecil Hooker's apartment, and the metal canister with the cocaine found underneath the Santa Mercedes in Tacoma. Schmidt recognizes that physical evidence will not be suppressed because of illegal conduct by foreign officials which violates the Fourth Amendment. *Stonehill v. United States*, 405 F.2d 738, 742–44 (9 Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969), *reh. denied*, 396 U.S. 870, 90 S.Ct. 39, 24 L.Ed.2d 125 (1969). Rather, he contends the physical evidence was a product of his coerced confession making its introduction at trial a violation of his Fifth Amendment right against self-incrimination.

This argument depends on (1) a legal showing that the exclusionary rule under the Fifth Amendment applies to physical evidence which is the product of statements illegally obtained by foreign officials, and (2) a factual showing that the disputed physical evidence was a product of Schmidt's coerced statements. The legal issue is apparently one of first impression which presents the interesting question of the applicability of the exclusionary rule in Fifth Amendment cases involving illegal conduct by foreign officials. However, we do not resolve that issue because the physical evidence in dispute has not been shown to be the product of any illegally coerced statements made by Richard Schmidt.

■ The rubber boat, surgical tubing and passport were discovered in the car at the beach *before* Schmidt had been subjected to abusive treatment and *before* he made any coerced statements. Soon after his apprehension Schmidt was assisted by his friend, Commander Petrozzi, who interceded on Schmidt's behalf to help him find his clothing at the beach. There the navy police found Hooker and the car. Schmidt had voluntarily led the police to this location to find his clothing.[8] *See generally Agius v. United States*, 413 F.2d 915, 919–20 (5 Cir. 1969), *cert. denied*, 397 U.S. 992, 90 S.Ct. 1116, 25 L.Ed.2d 399 (1970) (Suspect willingly led police to his car where incriminating evidence was in plain view.). This evidence was discovered at least an entire day before any incriminating statements were forced from Schmidt.

■ Likewise, the search of the apartments of James and Cecil Hooker cannot be tied to any statements coerced from Schmidt. The record does not explain what actually motivated these searches. This alone is fatal to Schmidt's contention, particularly since the searches can be easily explained without reference to any of Schmidt's statements. Once James Hooker was discovered at the beach it would be normal investigative procedure to search his apartment. Hooker's father was suspected of assisting an attempted escape from the PIP prison. The search of his apartment was related to this suspicion, not Schmidt's statements.

■ Finally, the search of the Santa Mercedes was the product of Schmidt's freely given statements to the DEA. Schmidt had voluntarily disclosed the smuggling scheme to the American agents seven days before the Santa Mercedes arrived in the United States. It was this disclosure which was relayed to Seattle and which eventuated in the search of the hull of the Santa Mercedes, not Schmidt's coerced disclosures to the Peruvian authorities.[9]

8. Schmidt's decision to take the police to the location of his clothing is not made involuntary by the fact that his clothes were subsequently either misplaced, confiscated or stolen. The record shows that due to Commander Petrozzi's efforts on Schmidt's behalf the police made a good faith effort to find his clothes for him.

9. Even if the search of the hull of the Santa Mercedes were considered the result of one of Schmidt's coerced statements, the resulting canister of cocaine would have been discovered by independent investigative procedures. Schmidt had been seen diving directly beneath the Santa Mercedes in Lima. The police in both countries suspected either sabotage or drug trafficking. Since the Santa Mercedes left the Callao Harbor before a search of its hull could be organized in Peru, it almost certainly would have been searched upon arrival in Tacoma. If evidence, otherwise inadmissible under the exclusionary rule, would have been

The disputed physical evidence was obtained independently of the statements coerced from Schmidt by the Peruvian authorities. Its introduction at trial was not error.

## C. Alleged United States Government Interference with the Defense Investigation.

In conjunction with his pretrial motion to suppress Schmidt also argued the indictment should be dismissed because the U. S. representatives in Peru interfered with his investigator. After a lengthy pretrial hearing the trial judge made the specific finding that the United States government in Peru 'did not interfere with the defense investigation.[10] On appeal defendant's assertion that his investigator's efforts were obstructed must be construed to be a challenge of the sufficiency of the evidence to support the trial court's finding.

██ The resolution of conflicting facts or conflicting inferences at a pretrial hearing is another responsibility which is primarily one for the trial judge. Findings of fact made by the trial court in pretrial proceedings are conclusive unless clearly erroneous. *Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1962); *United States v. Hart*, 546 F.2d 798, 801–02 (9 Cir. 1976) (en banc) *cert. denied*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 571 (1977); *United States v. Welp*, 469 F.2d 688 (9 Cir. 1972); *United States v. Page*, 302 F.2d 81, 84–85 (9 Cir. 1962) (en banc). *See Green v. United States*, 128 U.S.App.D.C. 408, 411, 389 F.2d 949, 952 (1967); *Jackson v. United States*, 122 U.S.App.D.C. 324, 326–327, 353 F.2d 862, 864–65 (1965). *See also* Wright, Federal Practice & Procedure: Criminal § 375 at 18. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947).

██ The evidence adduced at the pretrial hearing and the trial, particularly the testimony of the defense investigator, Jeffrey Steinborn, reveals more than adequate support for the findings of the trial court. Steinborn contends the U.S. Consul General denied him the right to take depositions. But he admits this information was secondhand from a lower embassy official and that *after* receiving this information he received instructions as to whom he should contact to set the dates and times for his intended depositions. The DEA agent who was to represent the U.S. Attorney at the depositions met Steinborn and offered his assistance, but was told no depositions were yet scheduled.

---

discovered independently, it need not be excluded. *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Jackson*, 448 F.2d 963, 970 (9 Cir. 1971), *cert. denied, sub nom. Willis v. United States*, 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972); *United States v. Seohnlein*, 423 F.2d 1051, 1053 (4 Cir. 1970), *cert. denied*, 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Wayne v. United States*, 115 U.S.App. D.C. 234, 238, 318 F.2d 205, 209 (1963), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 796–797, 300 N.E.2d 139, 141–42 (C.A.N.Y.1973) *cert. denied*, 414 U.S. 1033, 1050, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Lockridge v. Superior Court of Los Angeles County*, 3 Cal.3d 166, 89 Cal.Rptr. 731, 474 P.2d 683 (1970), *cert. denied*, 402 U.S. 910, 91 S.Ct. 1387, 28 L.Ed.2d 652 (1971). *See* Note, 43 A.L.R.3d 385, 404; McGuire, "How to Unpoison the Fruit," 55 J.Crim.L.C.&.P.S. 307, 313–

17 (1964). *But see* Pitler, "Fruit of the Poisonous Tree," 56 Cal.L.Rev. 579, 627–30 (1968).

10. The court held:
"... I do not find that the United States Embassy officials obstructed Mr. Steinborn in his mission. I do not find that his efforts were thwarted by the Embassy officials. Mr. Steinborn indicated that he considered and treated the DEA people and, later, somewhat the Embassy people as adversaries. Instead of seeking their cooperation and the cooperation of the United States Attorney General's Office, Mr. Steinborn felt in his client's best interest to go it alone, and it didn't work out.
"As a matter of fact, I gather the individual that he was planning on deposing, the lawyer, apparently changed his mind after his initial conversation with Mr. Steinborn and apparently he would not have cooperated if a deposition had been taken." R.T. 348–49.

No depositions ever were scheduled, but not because the Consul General prohibited them. Steinborn admitted he personally chose not to take the risk of trying to depose any Peruvian military personnel. The only other person he actively sought to depose was a Peruvian attorney who ultimately refused to cooperate.

Steinborn also contends that during his initial meeting with the Consul General he was intimidated into restricting his investigation. Yet he can point to nothing other than the "atmosphere" of the discussion to support his contention. At this meeting the Consul General explained the political and legal situation in Peru to Steinborn, warning him that his investigation might upset the Peruvian authorities. Steinborn was also told that because the U.S. Embassy's position in Peru was "not very strong", it would not be able to help him much if he got into serious trouble. This information must have been disconcerting, but was not an act of interference by United States officials.

Not only did the U.S. Embassy refrain from interfering with the investigation, it assisted where possible. In addition to warning Steinborn to be cautious in his dealings with the Peruvian government, the Embassy assigned a specific DEA agent to be available to assist Steinborn upon request. No request for assistance was ever made. Twice the Embassy helped Steinborn obtain entrance to Lurigancho Prison to interview prisoners. Although the Embassy stood ready to help depose them, the prisoners would communicate to Steinborn only in private, so could not be deposed. Still, Steinborn took unofficial statements from some of the prisoners which the U.S. Consul General offered to mark with an official stamp. Steinborn refused because he did not want the Consul General to read the statements. At one point Steinborn even rejected an offer of assistance from the U.S. Attorney in Seattle.

Steinborn unjustifiedly considered the U.S. officials in Peru to be his adversaries and refused their assistance. Although conditions in Peru made his investigation difficult, responsibility for Steinborn's failure to obtain relevant depositions cannot be placed on the United States.

## IV. CONCLUSION

The judgment of the district court is affirmed.

HUFSTEDLER, Circuit Judge, concurring and dissenting:

I would reverse this conviction and remand the case for a new trial because Schmidt's confessions to the DEA agents were involuntary as a matter of law and their admission violated Schmidt's right to due process of law and his privilege against self-incrimination. I would also direct the district court, on remand, to decide whether the discovery of the canister affixed to the *Santa Mercedes* after the vessel reached Seattle was the product of Schmidt's confessions, rather than solely the product of searches and seizures conducted by Peruvian authorities. If the canister found in Seattle was the fruit of the illegal confessions, I would direct that the canister of cocaine be suppressed.

## I

The first question is whether Schmidt's inculpatory admissions to the DEA agents were involuntary under the totality of the circumstances. We must address that question following an independent examination of the whole record. (*Clewis v. Texas* (1967) 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423; *Culombe v. Connecticut* (1961) 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037.) "When conceded facts exist which are irreconcilable with such mental freedom, regardless of the contrary conclusions of the triers of fact, whether judge or jury, this Court cannot avoid responsibility for such injustice by leaving the burden of adjudication solely in other hands." (*Lyons v. Oklahoma* (1944) 322 U.S. 596, 602, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481.)

Schmidt's treatment by the Peruvian authorities was characterized throughout by physical brutality and incarceration under

appalling conditions. The district court found that Schmidt's testimony about his treatment by Peruvian authorities was true. In briefest compass, Schmidt testified that he was arrested by Peruvian naval authorities while swimming in the harbor near Lima, Peru, on the night of January 6–7, 1976. The Peruvian naval authorities took Schmidt to a military compound, made him remove his skin diving suit, and interrogated him all night long. He was accused of being a spy. Peruvian authorities slapped him and hit him on the back of the head. His requests to see someone from the American Embassy were denied. However, after several hours of interrogation, the Peruvian authorities yielded to his request to see Commander Petrozzi, whom he knew. He told Petrozzi that his clothes were left on the beach, and he responded affirmatively when Petrozzi asked him if he could take "us" to his clothes. Schmidt went to the beach in the company of five Peruvian military people, armed with machine guns. He found his clothes, and Jim Hooker, who was lying on the ground moaning. Hooker and Schmidt were put back into the car and returned to the military compound.

The naval authorities continued to question Schmidt throughout the rest of the night and into the following morning. His renewed requests to see a representative of the American Embassy or to see a lawyer were again denied. At the end of the second day, Schmidt attempted to escape. He was recaptured the following morning, beaten again and returned to the military compound. He was incarcerated in a small room for several days, during which he was constantly awakened, slapped and kicked, and the interrogation continued.

About two days later, men rushed in at three o'clock in the morning and put a hood over his head. His hands were handcuffed behind his back and he was taken to a Jeep. He was delivered to a building and thrown upon a mattress. Peruvian authorities then put him in a chair. While his arms were held, his interrogators slapped him repeatedly. His captors then forced his head into a bucket of water and held him down, while the back of his head was beaten.

After hours of this treatment and the promise of greater tortures, the Peruvian authorities compelled him to make a confession recorded on a tape recorder. Finally, they returned him to the military compound. Two days later, Schmidt became delirious, collapsed, and was taken to a hospital.

When he reached the hospital, Schmidt was transferred to the custody of the Peruvian narcotics section, called "PIP." Shortly after he reached the hospital, Schmidt was interviewed by Rubio, an English-speaking PIP officer. Rubio had received information about Schmidt's suspected involvement in a drug operation involving the ship *Santa Mercedes*. While interrogating Schmidt in the hospital, Rubio struck Schmidt and "slapped him around." Schmidt's vomiting interrupted the interrogation from time to time.

Schmidt was released from the hospital and taken to the narcotics prison. His detention cell was revolting. He shared the cell with eight people, most of them sick, one of them shot, and none of them receiving medical attention. "[P]eople were moaning, people were crying, there was one mattress for the eight of us, and we would stretch it out lengthwise at night, and we could lie sidewise on it so we could get our shoulders and part of our hips on the mattress, and we would like—well, cuddle together there for warmth, and people would be coughing and spitting up, then there was the whole terror of the situation because the guards would come for these people." Rubio interrogated Schmidt day and night. Two days after his first confinement in the narcotics cell, Rubio typed up a confession and forced Schmidt to sign it.

Schmidt admitted that he was somewhat confused about the exact dates, but there is no doubt that the confession was signed after Schmidt met with DEA Agents Hamm and Boggs. According to the agents, Schmidt made damaging admissions to them on two separate occasions. The first interview took place on January 16, 1976, shortly before noon, and lasted about

twenty minutes. The meeting was in Rubio's office, the same office where Rubio had beaten and interrogated Schmidt. The Peruvian written "confession" was dated January 16, 1976, 5:45 p. m. The agents testified that at the first meeting Schmidt told them that his role in the whole thing was that of an adventurer, that he had nothing to do with cocaine, and that he was simply there to attach the cocaine canister to the bottom of the *Santa Mercedes*. At the time of the first interview, Schmidt believed that the substance of his statements to Peruvian authorities had been relayed to the DEA agents. Rubio testified that he had talked to Agent Hamm before any American talked to Schmidt. Schmidt testified that during the course of the first interview, one of the DEA agents told him that they had all the information from PIP.

A second interview took place on February 2, with Agents Boggs and Hamm, and a third on Feburary 3, with Agent Garland also present. Agent Boggs testified that Schmidt made no incriminating admissions at the February 2 meeting. According to Agent Garland, Schmidt was more reticent on February 3 than he had been at the first meeting, but after he had been admonished that he had caused danger to the vessel by attaching the canister too close to the rudder, Schmidt told the agents that he had not meant to endanger anyone's life.

As the majority opinion observes, Schmidt is both well educated and intelligent. He was not afraid of the DEA agents. The agents gave him a *Miranda* warning, and it is evident that he understood the warning. No contention is made that the statements to the DEA agents were taken in violation of the *Miranda* rule.

In my view, the conditions under which the statements were made to the DEA agents were inherently coercive and the making of the statements was directly attributable to the confession that the Peruvian authorities had extracted by torture. Schmidt was in a Peruvian prison, and was awaiting criminal process under Peruvian law. He knew that the Peruvian authorities had theretofore told the DEA agents about what they had learned during his incarceration and abuse.

From the earliest days of our Republic, confessions were not admissible unless "the confession is made freely, voluntarily and without compulsion or inducement of any sort." (*Wilson v. United States* (1896) 162 U.S. 613, 623, 16 S.Ct. 895, 899, 40 L.Ed. 1090; *Bram v. United States* (1897) 168 U.S. 532, 548, 18 S.Ct. 183, 42 L.Ed. 568.) Even without the grueling treatment that he had received at the hands of Peruvian authorities, interrogation by the DEA agents was coercive. Schmidt's situation with the DEA was far more coercive than that of the defendant in *Bram, supra,* in which the Supreme Court held that the inculpatory admissions made to a foreign police officer violated his privilege against self-incrimination.

Bram was the First Officer of an American vessel on a voyage during which the Captain of the vessel, the Captain's wife, and the Second Mate were all brutally murdered. Suspicion first focused upon Seaman Brown, who said to some of his shipmates that he saw Bram kill the Captain as he was watching through a window in the cabin. While in custody in Halifax, first Brown and then Bram were questioned by a Halifax police officer. Bram was stripped of his clothing, but was not in any other way abused or intimidated. The examining officer testified that he offered nothing in the way of any inducements, nor did he attempt to exercise any influence to persuade Bram to respond to the interrogation. During the course of the interview, the officer told Bram that he had talked to Brown and that Brown had accused him of murder. He testified that Bram replied, "He could not have seen me; where was he?" The officer responded, "He states he was at the wheel." Bram answered, "Well, he could not see me from there." The officer said that he then told Bram that he did not think Bram could. have committed the crime alone, and sought to have Bram name his accomplice so that he would "not have the blame of this horrible crime on your own shoulders." Bram answered that

he did not know anything about the crime, but that he thought Brown was the murderer.

The Court said that "the situation of the accused, and the nature of the communication made to him by the detective, necessarily overthrows any possible implication that his reply to the detective could have been the result of a purely voluntary mental action; that is to say, when all the surrounding circumstances are considered in their true relations, not only is the claim that the statement was voluntary overthrown, but the impression is irresistibly produced that it must necessarily have been the result of either hope of fear, or both, operating on the mind," (168 U.S. at 562, 18 S.Ct. at 194.)

Schmidt's confession to the DEA agents on January 16 was made during a twenty-minute interval between abusive interrogation rounds by the Peruvian officials. "[With] the state of mind of one situated as was the prisoner when the confession was made, how in reason can it be said that the answer that he gave and which was required by the situation was wholly voluntary and in no manner influenced by the force of hope or fear? To so conclude would be to deny the necessary relation of cause and effect." (*Bram v. United States, supra,* 168 U.S. at 562–63, 18 S.Ct. at 194.)

Here, as in *Clewis v. Texas* (1967) 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423, there was "no break in the stream of events" from the time Schmidt was taken into custody by the Peruvian authorities to the time he made the first statement on January 16 and his later statement on February 3 or 4, 1976, to the DEA agents. Upon the facts found by the district court, the combination of circumstances " 'is so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear.' *Ashcraft v. Tennessee,* 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192." (*Reck v. Pate* (1961) 367 U.S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948. *Accord Leyra v. Denno* (1954) 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed.

948; *Fikes v. Alabama* (1957) 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246.)

The Supreme Court has repeatedly held that successive confessions by a defendant whose earlier confessions were involuntarily obtained are inadmissible under the due process clause where the coercive effect of the first confession was a significant factor influencing the later confessions. (*E. g., Clewis v. Texas, supra,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423; *Culombe v. Connecticut, supra,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037; *Malinski v. New York* (1945) 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; *Beecher v. Alabama* (1972) 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317; *Brown v. Mississippi* (1936) 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682.)

The majority correctly points out that the Supreme Court has never gone so far as to hold that the making of a confession under circumstances which preclude its use perpetually disables the confessor from making a usable confession. The question is whether there was continued influence of the earlier prior confession which vitiated the later one. That determination depends upon the totality of circumstances. "The effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary." (*Lyons v. Oklahoma* (1944) 322 U.S. 596, 603, 64 S.Ct. 1208, 1213, 88 L.Ed. 1481.) When a first confession is not made under circumstances involving physical brutality, threats of physical brutality, terror-arousing tactics, and other such "obvious, crude devices" (*Culombe v. Connecticut, supra,* 367 U.S. at 622, 81 S.Ct. 1860) and where the second confession is taken under nonoppressive circumstances, substantially removed in time and place from the first confession, a later confession may be free from the taint of the first. (*E. g., United States v. Bayer* (1947) 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (first confession made after incommunicado military detention; second confession made six months later to FBI agent); *Knott v. Howard* (1st Cir. 1975) 511 F.2d 1060 (first confession with-

out *Miranda* warnings; second confession substantially removed from first in both time and place); *United States v. Thor* (5th Cir. 1975) 512 F.2d 811 (confession given to California authorities after four-day delay in taking defendant before a magistrate followed by second confession a few weeks later to federal officers in Texas).) [1]

I assume that the DEA agents were not conducting a joint operation with the Peruvian authorities. Of course, if the DEA agents had been undertaking a cooperative venture in obtaining the statements of Schmidt, all of the confessions would have been patently illegal. The lack of some kind of joint venture between American and Peruvian authorities, however, in no way avoids the impact of the treatment of Schmidt by Peruvian authorities upon the responses by him to questioning of the DEA agents. Here, as in *Westover v. United States*, a companion case to *Miranda v. State of Arizona*, 384 U.S. 436, 494–97, 86 S.Ct. 1602, 16 L.Ed.2d 694, the two law enforcement authorities were legally distinct. "Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. Under these circumstances, an intelligent waiver of constitutional rights cannot be assumed." (384 U.S. at 496, 86 S.Ct. at 1639.) "We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them with-

out appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege." [2]

Exclusion of confessions obtained as these were does not in any way depend upon a judicial attempt to regulate the conduct and practices of Peruvian law enforcement officials. Neither the privilege against self-incrimination nor the due process clause protected Schmidt from the conduct of the Peruvian authorities. Both due process and the Fifth Amendment prevent American authorities from taking advantage of information extracted from Schmidt by the Peruvians and from admission against him of the fruits of those confessions in a federal trial. The means used to obtain Schmidt's confessions offend the principles of "justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (*Brown v. Mississippi, supra,* 297 U.S. 278, 56 S.Ct. 461, 464,

---

1. This case bears no resemblance to cases cited in the majority opinion such as *United States v. Toral* (9th Cir. 1976) 536 F.2d 893, and *Tanner v. Vincent* (2d Cir. 1976) 541 F.2d 932, in which the sole coercion was implied from the failure to give adequate *Miranda* warnings when the defendant first confessed, followed by a later confession after full *Miranda* warnings were given. To the same effect, *United States v. Knight* (2d Cir. 1968) 395 F.2d 971 (inculpatory statements made by defendant in his home to local police without *Miranda* warnings; later statements to FBI agents after *Miranda* warnings); *United States v. Shea* (9th Cir. 1970) 436 F.2d 740 (first statement made to Brazilian authorities without *Miranda* warnings; second statement made five days later after *Miranda* warnings to American authorities in New York). *Cotton v. United States* (9th Cir. 1967)

371 F.2d 385 is not in point. The sole question in *Cotton* was the admissibility of statements made without *Miranda* warnings prior to the effective date of *Miranda.*

2. The majority's statement that Schmidt's legal training was more than adequate to impute to him knowledge that his prior confession to Peruvian naval authorities and his forced signature on the confession prepared by the PIP were inadmissible in any American prosecution cannot be a factor in insulating the confessions to the DEA agents from the effects of the Peruvian mistreatment. Indeed, the observation is ironic, in view of the fact that the government tried to obtain admission of the Peruvian confessions in Schmidt's trial.

80 L.Ed. 682.) "It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of [Schmidt], and the use of the confessions thus obtained as the basis for conviction and sentence was a clear denial of due process." (*Id.* at 285–86, 56 S.Ct. at 465.)

## II

I turn to the questions raised by the objections to the admissibility of the physical evidence.

Solely under the compulsion of *Stonehill v. United States* (9th Cir. 1968) 405 F.2d 738, I concur in the majority's conclusion that the physical evidence other than the metal canister containing cocaine found on the *Santa Mercedes* was admissible. That evidence was discovered by Peruvian authorities before Schmidt had made any confessions to anyone. The district court determined that this evidence was obtained by Peruvian authorities under circumstances which, if obtained by American authorities, would have violated the Fourth Amendment. Applying *Stonehill*, however, the district court held that the foreign "silver platter" doctrine applied, and the evidence was accordingly admissible. If the question were open in this Circuit, I would adopt the reasoning of Judge Browning, dissenting in *Stonehill*. (405 F.2d at 747, *et seq.*)[3]

The motion to suppress the canister attached to the *Santa Mercedes* presents very different issues from suppression of the other physical evidence. The district court never reached the question whether the finding of the canister was the product of confessions made to the DEA agents or to Peruvian authorities, because it held that the statements to the DEA agents were voluntary and the silver platter doctrine applied to insulate the search of the *Santa Mercedes* from illegal confessions obtained by the Peruvians as well as from the illegal searches conducted by the Peruvian author-

ities. For the same reasons, the district court did not consider the question whether the canister should have been suppressed as the fruit of the "poisoned tree" confessions.

The first issue which must be addressed is whether the physical evidence found as a result of a coerced confession must be excluded under the fruit of the poisoned tree doctrine. The precise question has not yet been definitively answered by the Supreme Court. However, the rationale of the cases applying the doctrine leads inevitably to the conclusion that physical evidence obtained as a result of a coerced confession is inadmissible.

The reasoning was expressed by Mr. Justice Holmes in *Silverthorne Lumber Co. v. United States* (1920) 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, in explaining why the Government could not make use of information obtained during an unlawful search to subpoena from the victims the very documents illegally viewed: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court, but that it shall not be used at all. . . . If knowledge of them is gained from an independent source, they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." (251 U.S. at 392, 40 S.Ct. at 183.) The same rationale was used in *Wong Sun v. United States* (1963) 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, holding that inculpatory statements obtained by an entry in violation of the Fourth Amendment must be excluded as the fruit of the illegal entry. "[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. . . . Nor do the policies underlying the exclusionary rule invite any logical

---

**3.** I disagree with the majority's characterization that Schmidt had "voluntarily" led the Peruvian police to the location of his clothing on the beach. I am unable to equate Schmidt's trip to the beach in the company of five Peruvian guards armed with machine guns with a voluntary excursion.

distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers [citation omitted], or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained [citation omitted], the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction." (371 U.S. at 485–86, 83 S.Ct. at 416.)

The poisoned tree principle was extended in *Harrison v. United States* (1968) 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047, to foreclose reception of a defendant's testimony at an earlier trial which was induced by the admission against him in the same trial of an illegally obtained confession.

No distinction either in logic or in principle exists between excluding inculpatory admissions obtained as the result of an illegal intrusion into a person's home (*Wong Sun*) and excluding physical evidence that was obtained as a result of coerced confessions. That verbal admissions in *Wong Sun* were obtained in violation of the Fourth Amendment and that the physical evidence in this case was obtained in violation of Schmidt's Fifth Amendment and due process rights makes no constitutional difference in applying the exclusionary rule. (*E. g., The Government of Virgin Islands v. Gereau* (3d Cir. 1974) 502 F.2d 914; *People v. Schader* (1969) 71 Cal.2d 761, 80 Cal.Rptr. 1, 457 P.2d 841. *See also* Model Code of Evidence, Rule 505, Comment c (1942). *Cf. Gladden v. Holland* (9th Cir. 1966) 366 F.2d 580 (guilty plea induced by involuntary confession set aside; neither the confession, nor any incriminating statements made

during interrogation, nor the fruits thereof, could be used on trial).)

The majority opinion correctly observes that the canister of cocaine would be admissible if it had been discovered by evidence developed from an untainted, independent source. However, the Government bears a heavy burden to show that the seizure of the canister was not the product of coerced confessions, but of such other independent and untainted sources. (*E. g., Harrison v. United States, supra,* 392 U.S. at 224–25, 88 S.Ct. 2008; *Alderman v. United States* (1969) 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176.)

We need not and should not decide whether the Government carried its burden because that issue was never addressed by the district court. The majority's gratuitous comment that the canister would have been discovered in any event is no more than conjecture. The district court should decide in the first instance whether the Government has met its burden of proving that the recovery of the canister was not the fruit of Schmidt's confessions to the DEA agents.[4] As the majority opinion acknowledges, the record established *prima facie* that the discovery of the canister was traceable to Schmidt's confessions to the DEA agents. For this reason, it is unnecessary for the district court to reach the question, heretofore unresolved, whether the silver platter doctrine can be extended to permit the use by federal agents of illegal confessions obtained by foreign governments for the purpose of obtaining physical evidence.[5] Even if it were assumed, ar-

---

**4.** *See Brewer v. Williams* (1977) 430 U.S. 387, 406–07, n. 12, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424: "The District Court stated that its decision 'does not touch upon the issue of what evidence, if any, beyond the incriminating statements themselves must be excluded as "fruit of the poisonous tree"' 375 F.Supp. 170, 185, D.C. We, too, have no occasion to address this issue . . . . While neither Wiliams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body

would have been discovered in any event, even had incriminating statements not been elicited from Williams. *Cf. Killough v. United States,* 119 U.S.App.D.C. 10, 336 F.2d 929. In the event that a retrial is instituted, it will be for the state courts in the first instance to determine whether particular items of evidence may be admitted."

**5.** *Stonehill v. United States, supra,* 405 F.2d 738, 9 Cir., upon which the district court relied, did not involve due process violations or the violation of the defendant's privilege against self-incrimination. The decision revived the silver platter doctrine only in connection with

*guendo*, that any American use of Schmidt's confessions to the Peruvians was not constitutionally forbidden, those confessions could not be considered a wholly independent and untainted source justifying search and seizure of the canister.

I would reverse the conviction for prejudicial error in the admission of the coerced confessions to the DEA agents. I would also vacate the order denying the motion to suppress the canister and direct the district court to make the initial determination whether the Government carried its heavy burden of proof to establish that the canister was found solely on the basis of information obtained by means independent of the coerced confessions.

searches and seizures by foreign governments, which, if conducted in the United States, would have been a violation of the Fourth Amendment.